[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4371

THE STATE OF OHIO, APPELLEE, *v*. WEAVER, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371.]**

*Postconviction—A postconviction petitioner should be entitled to a fair and impartial fact-finder when an evidentiary hearing has been granted—When a record demonstrates bias or prejudice on the part of a fact-finder, an appellate court should reverse the trial court's judgment—Court of appeals' judgment reversed and cause remanded.*

(No. 2021-0622—Submitted April 27, 2022—Decided December 8, 2022.)

APPEAL from the Court of Appeals for Muskingum County,
No. CT2019-0034, 2021-Ohio-1025.

_____

**O'CONNOR, C.J.**

{¶ 1} In 2016, after the death of her newborn, appellant, Emile Weaver, was found guilty of one count of aggravated murder, one count of gross abuse of a corpse, and two counts of tampering with evidence.  The trial court sentenced

Weaver to life in prison without the possibility of parole for the aggravated murder. At sentencing, Weaver's trial counsel briefly mentioned the term neonaticide[1] but failed to explain neonaticide and its applicability to Weaver's case. The Fifth District Court of Appeals affirmed the judgment of the trial court and Weaver's sentence. 2017-Ohio-4374, 93 N.E.3d 178, ¶ 41 ("*Weaver I*").

{¶ 2} One year after her convictions, Weaver filed a petition for postconviction relief, arguing that her trial counsel was ineffective for failing to present evidence about neonaticide as a mitigating factor. Applying the doctrine of res judicata, the trial court denied her petition for postconviction relief without an evidentiary hearing. The Fifth District reversed the trial court's judgment and remanded the matter to the trial court to conduct an evidentiary hearing. 2018-Ohio-2509, 114 N.E.3d 766, ¶ 33 ("*Weaver II*"). After a contentious evidentiary hearing, the trial court once again denied Weaver's petition for postconviction relief, and the Fifth District affirmed the trial court's judgment. 2021-Ohio-1025, ¶ 50 ("*Weaver III*").

{¶ 3} Because the trial court's decision denying Weaver's petition for postconviction relief was unreasonable and arbitrary and not based on competent and credible evidence, we hold that the court abused its discretion in denying Weaver's petition for postconviction relief. And because the court of appeals held otherwise, we reverse its judgment and remand this case to the trial court to conduct a new sentencing hearing.

---

1. Over 50 years ago, the term "neonaticide" was identified and defined as the killing of an infant within 24 hours of childbirth. *See* Oberman, *Mothers Who Kill: Coming to Terms with Modern American Infanticide*, 34 Am.Crim.L.Rev. 1, 22 (1996). By focusing on the patterns and circumstances surrounding neonaticide, researchers explain that the act, generally perceived as "incomprehensible," *id*. at 68, can be more fully understood both as "distinctly unlike more 'meditated' homicides," *id*. at 78, and as "more than isolated occurrences perpetrated by careless, ignorant, or indifferent women," *id*. at 20. Rather, in the context of social and cultural norms, researchers suggest that neonaticide can be understood as an act of desperation by young, unwed, and socially isolated women. *Id*. at 23-24, 71.

## I. RELEVANT BACKGROUND

### A. Trial and direct appeal

{¶ 4} In the fall of 2014, Weaver returned as a sophomore to Muskingum University in New Concord, Ohio, where she lived in a campus sorority house.[2] After Weaver visited a wellness center to obtain birth control, the center reached out to her to let her know that she was pregnant, but Weaver testified that she had never looked at or read the message from the center. Weaver also testified that she did not "completely" believe that she was pregnant, because she did not show the normal signs of pregnancy—specifically, she did not (1) gain weight, (2) have morning sickness or exhaustion, or (3) stop menstruating. Throughout her pregnancy, Weaver consistently denied that she was pregnant when either her sorority sisters or other people asked, and she never told her mother. At trial, Weaver explained that she had lied about her pregnancy because she was scared, "felt like [she] had no one," and was "worried about * * * getting in trouble." Weaver did, however, discuss her pregnancy with her boyfriend—whom she had a "rocky relationship" with—and he encouraged her not to tell anyone. Weaver described him as "controlling and judgmental," as well as "abusive."

{¶ 5} On April 22, 2015, believing that she was having a bowel movement, Weaver went to the sorority-house bathroom. Shortly thereafter, she realized that she was in labor and silently, without assistance, delivered the baby into the toilet. Later that day, two sorority members discovered the baby in a trash bag lying next to the sorority house.

{¶ 6} Weaver was charged in the Muskingum County Common Pleas Court with one count of aggravated murder in violation of R.C. 2903.01, one count of gross abuse of a corpse in violation of R.C. 2927.01(B), and two counts of

---

2. Because this appeal primarily focuses on Weaver's trial counsel's alleged failure to provide neonaticide evidence as a mitigating factor, we will not dive into the full description of Weaver's trial and the underlying facts; but the Fifth District's description may be found in *Weaver I*, 2017-Ohio-4374, 93 N.E.3d 178, and *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766.

tampering with evidence in violation of R.C. 2921.12(A)(1). A jury found her guilty of all counts. At sentencing, defense counsel offered as mitigating evidence a short, cursory statement about neonaticide, but counsel did not explain that term or its potential impact on Weaver's sentence. The trial court merged the tampering-with-evidence charges and sentenced Weaver to life in prison without the possibility of parole for aggravated murder, one year in prison for gross abuse of a corpse, and three years for tampering with evidence. The trial court then ordered all the prison terms to be served consecutively to each other. In support of this sentence, the trial court found that (1) Weaver lacked remorse, (2) her crimes harmed her sorority sisters, (3) her conduct consisted of "the worst form" of aggravated murder, and (4) her "relationship with the victim caused [the crime]."

{¶ 7} On appeal, Weaver argued that the trial court had erred in imposing a sentence of life in prison without the possibility of parole for aggravated murder and that this sentence was disproportionate to her conduct. *Weaver I*, 2017-Ohio-4374, 93 N.E.3d 178, at ¶ 22. The Fifth District concluded that R.C. 2953.08(D)(3) barred it from reviewing Weaver's life-without-parole sentence. *Id*. at ¶ 21, 25. As a result, the court of appeals declined to review the merits of Weaver's claims regarding her life-without-parole sentence and affirmed the trial court's judgment. *Id*. at ¶ 41. We did not accept Weaver's discretionary appeal. 151 Ohio St.3d 1510, 2018-Ohio-365, 90 N.E.3d 950.

## B. Postconviction proceedings

*1. The trial court denied Weaver's petition for postconviction relief without an evidentiary hearing*

{¶ 8} In 2017, Weaver filed a petition for postconviction relief (and two subsequent amended petitions), alleging that her trial counsel was ineffective for failing to present evidence about neonaticide as a mitigating factor. In support of her petition, Weaver attached an article on neonaticide by Michelle Oberman, a former associate professor at DePaul University College of Law, and an affidavit

and report by Dr. Clara Lewis, a professor at Stanford University who has studied the social and cultural causes of neonaticide in America. After reviewing the evidence and conducting a personal interview with Weaver, Dr. Lewis opined in her affidavit that Weaver's case was "a typical example of contemporary neonaticide," that her life-without-parole sentence was "disproportionately harsh when compared to sentences given to others convicted of this crime," and that defense counsel's failure to "introduce relevant information about the social and cultural causes of neonaticide" deprived the trial court of "information that would have provided context for understanding [Weaver's] crime" and would have provided mitigating evidence.

{¶ 9} In her report, Dr. Lewis explained that many people find it "impossible" to understand how and why a woman could commit neonaticide; but research reveals and psychiatrists explain that neonaticide is "patterned" and that women who commit neonaticide fit a particular profile. For instance, Dr. Lewis noted that women who commit neonaticide "tend to be immature, isolated, worried about the judgment of others on issues ranging from sex to abortion to unwed motherhood" and they generally "receive no prenatal care, suffer from pregnancy denial, make no plans for their labor or delivery, and labor alone on toilets without medical care." And when the baby arrives, "their denial shatters and panic ensues," leading these women to respond with "poorly concealed acts of desperation." Dr. Lewis emphasized that panic is "central" to cases involving neonaticide, which suggests that this crime is "not carefully planned."

{¶ 10} Dr. Lewis concluded that Weaver fit the typical personality and demographic profile and her actions followed the typical pattern, noting that Weaver's social isolation, her immaturity, and her boyfriend's insistence on secrecy during the pregnancy, as well as her sorority sisters' actions, all reinforced her isolating behavior and denial of the pregnancy. Accordingly, while Dr. Lewis acknowledged that Weaver deserved to be punished for her conduct, she

emphasized that presenting this existing body of research on neonaticide at Weaver's sentencing "would have demonstrated that there are substantial grounds to mitigate her individual culpability."

**{¶ 11}** The trial court denied Weaver's petition without an evidentiary hearing, concluding that her ineffective-assistance claim was barred by res judicata. Weaver appealed. The Fifth District concluded that the trial court erred in finding Weaver's ineffective-assistance claim barred by res judicata because the claim relied on evidence outside the record—i.e., Dr. Lewis's affidavit and report—and therefore, could not have been presented on direct appeal. *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766, at ¶ 23. It further found that Dr. Lewis's affidavit and report "explained the psychiatric and cultural issues surrounding neonaticide far beyond counsel's casual mention at the sentencing hearing, and provided information to contextualize the same actions which the court used to support the sentence of life without possibility of parole." *Id*. at ¶ 31. It noted that this neonaticide evidence cut directly against the state's arguments, which the trial court accepted, for imposing the harshest sentence available for aggravated murder. *Id*. The Fifth District accordingly reversed the trial court's judgment denying Weaver's petition for postconviction relief and remanded the case to the trial court to conduct an evidentiary hearing on her petition. *Id.* at ¶ 33. This court denied jurisdiction over the state's discretionary appeal. 153 Ohio St.3d 1504, 2018-Ohio-4285, 109 N.E.3d 1260.

2. *After an evidentiary hearing, the trial court again denied Weaver's petition for postconviction relief*

**{¶ 12}** On remand, the trial court held a two-day evidentiary hearing on Weaver's petition for postconviction relief. Dr. Lewis did not testify on Weaver's behalf, but Dr. Diana Barnes, a psychotherapist specializing in women's reproductive mental health, testified. Dr. Barnes also evaluated Weaver's case and produced a report, which was submitted as an exhibit during the hearing. Notably,

when Weaver first offered Dr. Barnes's expert testimony, the state did not object. Both Dr. Barnes's testimony and her report largely focused on the interplay between neonaticide and pregnancy-negation syndrome, and her opinion that Weaver met the criteria for pregnancy-negation syndrome, which "elevates the risks for neonaticide following childbirth."

{¶ 13} At the hearing, Dr. Barnes explained that a "closely associated" precursor to neonaticide is "pregnancy negation," a clinical syndrome that encompasses both the concepts of pregnancy denial and pregnancy concealment. She further explained that women with this syndrome will negate and detach from their pregnancies to the point that their bodies respond with fewer and less obvious physical signs of pregnancy, such as no morning sickness, no sensation of fetal movement, minimal or no weight gain, no recognition as to the start of labor, and continual spotting throughout the pregnancy. Labor often takes these women by surprise, Dr. Barnes noted, and they usually construe the physical signs of labor as the need to have a bowel movement. Dr. Barnes explained that these women generally fit the following profile: young, immature women who have suffered traumatic childhood events and who are experiencing social isolation and fear the reactions of others, often an abusive partner's or a parent's response to the pregnancy.

{¶ 14} Dr. Barnes explained that during the birthing experience, a woman with pregnancy-negation syndrome will experience a dissociative state in which she feels that she lacks control over her behavior and as if she is just an observer of the events passing before her, not a participant. Often, these women will, without assistance, deliver their baby into a toilet. Dr. Barnes further explained that once the baby is delivered, panic often ensues for the women, which creates thoughts of disorganization and dissociation, which subsequently affects their decision-making process, leading to neonaticide. Because women with pregnancy-negation syndrome distance themselves psychologically from the pregnancy for all nine

months, Dr. Barnes noted, they often act detached after the events of birth and neonaticide, which people may interpret as indifference.

{¶ 15} Dr. Barnes opined that Weaver met the criteria for pregnancy-negation syndrome. She noted that Weaver fit the personality and demographic profile of a young, immature woman, that she lacked many of the expected pregnancy-related symptoms—Weaver had not gained weight and continued to menstruate—and her birthing experience began with the mistaken belief that she was having a bowel movement and involved an unassisted delivery of the baby into the toilet. Based on her interview with Weaver and Weaver's mother, Dr. Barnes also concluded that Weaver "grew up in a home that was critical, rejecting, withholding of love, [and] judgmental," which established a belief for Weaver that "if you have a problem, you figure it out on your own, and you pretend that everything is okay."

{¶ 16} The fact that Weaver, after suffering deep internal vaginal lacerations and loss of blood during the birth, was discovered sitting cross-legged on her bed typing a term paper shortly after the birth, Dr. Barnes found, indicated her detachment from the reality of the situation. Dr. Barnes also found the video of Weaver's later interrogation as "noteworthy." Dr. Barnes believed that the interrogation video and Weaver's scores on certain diagnostic tests demonstrated Weaver's "capacity to remove herself from the external environment" and "go internally so that she [could] tolerate what [was] happening around her." Dr. Barnes testified that Weaver's dissociative state during the delivery, the social isolation in her family and at the time of her pregnancy, and her childhood trauma also fit into the general profile of women with pregnancy-negation syndrome.

{¶ 17} The state offered no expert testimony to rebut Dr. Barnes's opinion. Rather, after cross-examining Dr. Barnes, the state called five of Weaver's sorority sisters and one of her friends to the stand. The state questioned the sorority sisters about how Weaver had been treated within the sorority, whether they had asked

8

Weaver about the rumors of her pregnancy and what her reactions were to such questions, and how Weaver's conduct had affected them personally.

{¶ 18} Notably, the trial court asked two of Weaver's sorority sisters for their opinions regarding the following statements made by Dr. Lewis—and quoted by the court of appeals in *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766, at ¶ 12:

Birth takes hours. It is a painful and noisy process. Doing it alone, in silence, in a shared bathroom speaks to [Weaver's] abject terror, as well as to her belief that she had no one she could trust. Anyone might have averted this outcome by offering to help. Instead, she was left alone.

Neither of the sorority sisters agreed with Dr. Lewis's statements.

{¶ 19} Prior to closing arguments, the state moved to exclude Dr. Barnes's report and strike her testimony, arguing that she failed to meet the criteria to be designated as an expert. The trial court seemingly overruled the motion and the case proceeded to closing arguments. After hearing from both sides, the trial court ruled from the bench and denied Weaver's petition for postconviction relief. In its ruling, the trial court found "the testimony of Dr. Barnes to be the most unusual testimony [it had] heard in 40 years from an expert." It took issue with several aspects of Dr. Barnes's testimony, including that she would "bounce back and forth" between using the terms pregnancy concealment, pregnancy denial, and pregnancy negation, and that she used the "wrong" statistics in her report regarding the frequency of pregnancy negation. The trial court also found that Dr. Barnes "was not an M.D., and [the court had] a hard time calling [pregnancy-negation syndrome] a diagnosis."

{¶ 20} Weaver again appealed to the Fifth District, which affirmed the trial court's judgment denying Weaver's petition for postconviction relief. *Weaver III*,

2021-Ohio-1025, at ¶ 50. The court of appeals rejected Weaver's argument that the trial court was biased during the postconviction-relief hearing and found that although "the hearing was contentious," the record lacked evidence that would "overcome the strong presumption that the trial court was free of bias or prejudice" against Weaver or that would establish that the trial court's conduct denied Weaver her right to due process. *Id.* at ¶ 40. And by relying on the "well established" standard that an appellate court "may not substitute [its] own credibility determination for that of the trial court," the Fifth District rejected Weaver's challenge to the trial court's findings discounting Dr. Barnes's credibility. *Id.* at ¶ 47. Accordingly, the Fifth District held that "the court's decision finding trial counsel was not ineffective for failing to raise the issue of neonaticide in detail was not unreasonable, arbitrary, or unconscionable" and thus, the trial court did not abuse its discretion in denying Weaver's petition for postconviction relief. *Id.* at ¶ 49.

{¶ 21} We accepted Weaver's discretionary appeal, which presents two propositions of law. *See* 164 Ohio St.3d 1409, 2021-Ohio-2795, 172 N.E.3d 181. In her first proposition of law, Weaver argues that the level of deference an appellate court owes a trial court's postconviction determination of a postconviction witness's credibility is not as high as the level of deference it owes to a jury's trial-witness-credibility determination. In her second proposition of law, Weaver asserts that when a petitioner is granted a hearing on her petition for postconviction relief, she is entitled to a fair and impartial fact-finder and when the record demonstrates bias or prejudice on the part of the fact-finder, the appellate court should reverse the trial court's judgment.

## II. ANALYSIS

{¶ 22} At the heart of Weaver's propositions of law is a frustration with how the trial court resolved her petition for postconviction relief; specifically, that the trial court denied her petition based on its biases and personal attitude toward

the evidence, rather than based on a reasoned application of the standard for assessing ineffective-assistance-of-counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In support of her arguments, Weaver cites several of the trial court's actions, including its unsupported findings as to Dr. Barnes's credibility, its inappropriate questioning of Weaver's sorority sisters, and its swift decision from the bench. Weaver also argues that the court of appeals "blindly" deferred to the trial court's finding that Dr. Barnes was not credible and simply stated that it "may not substitute [its] own credibility determination for that of the trial court," *Weaver III* at ¶ 47, instead of reviewing whether the trial court's credibility determination was reasonable and supported by the record.

{¶ 23} In short, Weaver contends that the above-described actions by the trial court deprived her of "a fair and impartial factfinder," and the court of appeals' blind deference deprived her of "meaningful appellate review." To remedy these errors, Weaver proposes that we overrule, either in part or in whole, our decision in *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, and adopt a de novo standard of review in cases in which the postconviction-relief decisions "are not supported by competent and credible evidence" or when the same judge who presides over the petitioner's trial also presides over the petitioner's postconviction-relief proceedings.

**A. We decline Weaver's request that we overrule our decision in *Gondor* and adopt a de novo standard of review**

{¶ 24} In *Gondor*, this court plainly rejected a court of appeals' application of a de novo review in reversing a trial court's postconviction-relief findings and held that abuse of discretion is the proper standard for reviewing such findings. *Id.* at ¶ 58. We explained that the term "abuse of discretion" connotes that " 'the court's attitude is unreasonable, arbitrary or unconscionable.' " *Id.* at ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Stated differently,

an abuse of discretion involves more than a difference in opinion: the " 'term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.' " *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384, 94 N.W.2d 810 (1959). For a court of appeals to reach an abuse-of-discretion determination, the trial court's judgment must be so profoundly and wholly violative of fact and reason that " 'it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.' " *Id*., quoting *Spalding* at 384-385.

**{¶ 25}** We emphasized in *Gondor* that an abuse-of-discretion standard is especially appropriate in cases in which a petition for postconviction relief is based on a claim of ineffective assistance of counsel. *Id*. at ¶ 53-56. On direct appeal of a conviction, appellate courts generally review an ineffective-assistance-of-counsel claim de novo, which makes sense because "the issue originates at the appellate level" and "no trial court has held forth on the issue." *Id*. at ¶ 53. Petitions for postconviction relief that are based on ineffective-assistance claims, however, begin at the trial-court level, and the trial court may hold a hearing and receive testimony on the very issue of ineffective assistance. *Id*. at ¶ 54. At that hearing, the trial court "sees and hears the live postconviction witnesses, and [it] is therefore in a much better position to weigh their credibility than are the appellate judges." *Id*. at ¶ 55.

**{¶ 26}** We further emphasized that permitting "de novo review by appellate courts would relegate the postconviction trial court to a mere testimony-gathering apparatus." *Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶ 56. De novo review would effectively create "a clean slate on appeal," which would create a burden on "the overall administration of justice in Ohio" because every postconviction petitioner would be encouraged to seek another day in court by appealing trial courts' postconviction decisions. *Id*. Thus, we held that a trial

court's decision on "a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *Id*. at ¶ 58.

{¶ 27} In some cases, such as the present case, the evidence the trial court considers when determining whether to grant or deny a petition for postconviction relief includes expert-witness testimony. Generally, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts," *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus, and an appellate court should not substitute its judgment on such matters, *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978); *see also*, *State v. Waddy*, 63 Ohio St.3d 424, 430, 588 N.E.2d 819 (1992).

{¶ 28} Weaver emphasizes that our decisions in *DeHass* and *Walker* dealt with appellate review of a defendant's *convictions* and therefore those decisions prohibit an appellate court from substituting its judgment for that of *a jury*'s. Because Weaver's situation involves a *postconviction* hearing and a *trial court*'s finding on an expert witness's credibility, she asserts that deference to the trial court as the trier of fact should not be "automatic" and that the evidence should be reviewed de novo. In support of that argument, she points to the differences between judicial decision-making and jury decision-making, such as the fact that the rules of evidence prohibit an attorney from presenting evidence of a juror's reasons for voting the way he or she did. But, Weaver argues, judges are "often required to issue an opinion explaining their reasoning for the decisions that they make."

{¶ 29} These differences, however, are merely procedural and are irrelevant with regard to the primary reason for providing deference to the trier of fact: be it a jury or a trial judge, the trier of fact is " 'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations

in weighing the credibility of the proffered testimony.' " *State v. Amburgey*, 33 Ohio St.3d 115, 117, 515 N.E.2d 925 (1987), quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *see also Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶ 54. Weaver also fails to address the policy issues discussed in *Gondor* weighing against de novo review, *see id*. at ¶ 56. The reasons that justified the application of an abuse-of-discretion standard in *Gondor* are as relevant today as they were over a decade ago, and we therefore find Weaver's request to overrule *Gondor* in favor of a de novo standard of review unpersuasive. *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus (explaining that this court may overrule its precedent when (1) "changes in circumstances no longer justify continued adherence to the decision," (2) "the decision defies practical workability," and (3) "abandoning the precedent would not create an undue hardship for those who have relied upon it").

## B. The trial court abused its discretion in denying Weaver's petition for postconviction relief

{¶ 30} With the abuse-of-discretion standard in mind, we turn to the trial court's decision to deny Weaver's petition for postconviction relief and the court of appeals' decision to affirm the trial court's denial. The only issue before the trial court at the evidentiary hearing was whether Weaver's trial counsel was ineffective for failing to present information concerning neonaticide as a mitigating factor. Weaver contends that the trial court denied her petition for postconviction relief without any objective consideration of her ineffective-assistance claim. To demonstrate, she directs this court's attention to the trial court's unsupported findings regarding Dr. Barnes's credibility, its "inappropriate" questioning of Weaver's sorority sisters, and its nearly nonexistent application of *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 31} The state and amicus curiae, the Ohio Attorney General, on the other hand, contend that the trial court was not biased or unreasonable in denying Weaver's petition. They maintain that after finding that Dr. Barnes was not credible based on objective reasons, the trial court simply determined that Weaver failed to meet her burden to establish that her counsel was ineffective for not elaborating on neonaticide during sentencing. To resolve this case, we must review the trial court's findings supporting its denial of Weaver's petition for postconviction relief, beginning with the most significant: its finding that Dr. Barnes was not credible.

*1. The trial court arbitrarily disregarded Dr. Barnes's testimony*

{¶ 32} Weaver argues that the trial court abused its discretion when it disregarded Dr. Barnes's testimony "without good reason." In support of her argument, Weaver directs this court's attention to our decision in *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905.

{¶ 33} In *White*, this court held that the trial court abused its discretion in determining that the petitioner had failed to establish an intellectual disability when the trial court did not provide "any rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology." *Id*. at ¶ 70. We reasoned that while a "trial court is not required to automatically accept" an expert's opinion, such an opinion " 'may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony.' " (Emphasis sic.) *Id*. at ¶ 71, quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir.1978). We found no such objective reasons for the trial court's decision to disregard the uncontradicted expert testimony in that case, noting that (1) the trial court had focused its attention on largely irrelevant anecdotal evidence, *id*. at ¶ 72, (2) no evidence was offered calling into doubt the reliability of the test administered by the experts, *id*., and (3) the trial court made no finding that the expert witnesses lacked either credentials or credibility, *id*. at ¶ 73. We therefore concluded that "[w]hile the trial court is the trier of fact, it may

not disregard credible and uncontradicted expert testimony in favor of either perceptions of lay witnesses or of the court's own expectations," and that doing so demonstrated "an arbitrary, unreasonable attitude toward the evidence before the court and constitute[d] an abuse of discretion." *Id*. at ¶ 74.

{¶ 34} It is true that, unlike in *White*, the trial court here found Dr. Barnes's testimony "unbelievable and biased." But *White* holds that a trial court may not *arbitrarily* disregard an expert's opinion and that "some reason must be objectively present" for doing so, *id*. at ¶ 71, be it a lay witness's observations of the petitioner and a trial court's own expectations of how an intellectually disabled person would behave, as in *White*, or a trial court's unfounded and capricious credibility determination, as alleged here.

{¶ 35} Additionally, although an appellate court must not reweigh the witness testimony when reviewing a trial court's credibility determination, that *does not* mean it may skip reviewing a court's credibility determination of a witness in the name of deference, as the court of appeals did here. *See Weaver III*, 2021-Ohio-1025, at ¶ 47, 49. Had the Fifth District objectively reviewed the trial court's determination that Dr. Barnes was "unbelievable," it would have observed that the trial court's representation of Dr. Barnes's testimony as "unbelievable" was based on immaterial information, its own fundamental misunderstanding of neonaticide, and its own biases pertaining to the subject of Dr. Barnes's testimony. This is not a situation in which a reviewing court needs to guess at what informed a trial court's view of an expert's testimony. Here, the trial court made its distaste for Dr. Barnes quite clear on the record.

{¶ 36} Indeed, the trial court twice noted in its entry that Dr. Barnes was not a medical doctor. Although it acknowledged that Dr. Barnes has a Ph.D. in psychology, the court nevertheless stated: "She can't do some of the things she was asked to do with trying to apply brain trauma to the issues in this case because she's not a medical doctor." The trial court further remarked, "[s]ince she's not an MD,

I have a hard time calling it a diagnosis; but her findings." As a general point, given that psychologists can and do make diagnoses, the trial court's statements are ill-informed. And expertise in trauma and its application to the brain is not solely limited to medical doctors. In fact, it is one of the topics psychologists deal with often in their practice. *See* American Psychological Association, *Trauma*, https://www.apa.org/topics/trauma (accessed Sept. 1, 2022) [https://perma.cc/M42V-HRKA]. But beyond that, the trial court did not explain why the ability to apply "brain trauma" to the issues in this case weighed so heavily against *believing* Dr. Barnes's expert opinion that Weaver met the criteria for pregnancy-negation syndrome. Dr. Barnes testified about the numerous factors that must be taken into consideration, other than trauma, when determining whether a person meets the criteria for pregnancy-negation syndrome. The trial court's heavy reliance on this immaterial fact to completely disregard Dr. Barnes's testimony suggests that the trial court misunderstood the subject of pregnancy-negation syndrome and its relation to neonaticide.

{¶ 37} Further, the trial court characterized Dr. Barnes's testimony as "the most unusual testimony [it had] heard in 40 years from an expert." This is not an objective basis to disregard an expert's testimony. The fact that the court itself is not familiar with the substance of an expert's testimony is entirely unrelated to credibility; surely, countless trial-court judges hear expert testimony on subject matter with which they are completely unfamiliar. To permit a court's lack of familiarity with a topic to be a factor in assessing credibility would prejudice parties that are the first to present expert testimony on a subject matter or to present on a topic with which the trial court is unfamiliar. Establishing an expert's credibility should not depend on a mere hope that the trial-court judge has at least heard about a subject.

{¶ 38} The trial court also found Dr. Barnes to be "unbelievable and biased," noting at the evidentiary hearing that "she would bounce back and forth on

what is [pregnancy] denial, what is [pregnancy] concealment," and "when that didn't work, she came up with a third name for her diagnosis or whatever you want to call it." The state points to these findings as evidence that the trial court supported its credibility determination regarding Dr. Barnes with objective evidence. It asserts that the trial court's findings that Dr. Barnes "changed things as [she] went along" and that she "gave an excuse for everything that she didn't think went with her findings" are the findings that support its conclusion that she was not credible.

{¶ 39} But those statements exemplify the trial court's fundamental misunderstanding of Dr. Barnes's testimony regarding "pregnancy negation," a clinical syndrome encompassing both pregnancy denial and pregnancy concealment. The trial court also failed to understand how pregnancy-negation syndrome is a "closely associated" precursor to neonaticide and that it "elevates the risks for neonaticide following childbirth." Dr. Barnes did not "bounce back and forth," but rather explained several times during her testimony that pregnancy denial and pregnancy concealment are terms that "describe the same phenomenon with different intensity levels regarding the amount of conscious awareness throughout the pregnancy." The following characteristics are similar in both pregnancy denial and pregnancy concealment: (1) the physical manifestations or the behavioral strategies that the women with pregnancy denial or pregnancy concealment exhibit, (2) the absence of symptoms, (3) the personality and demographic profile of the women, and (4) the birth experience. Consequently, the terms are generally used interchangeably, and pregnancy-negation syndrome serves as a term to describe not just women who are in denial of their pregnancy but also women who have knowledge of their pregnancy and conceal it. Dr. Barnes emphasized again on redirect examination that the "current literature * * * talk[s] about [the terms] interchangeab[ly]," but what is important is not whether a woman falls in the category of pregnancy denial or concealment; it is whether she meets

18

the criteria for pregnancy-negation syndrome, which elevates her risk for neonaticide following childbirth.

{¶ 40} The above-described statements demonstrate that the trial court seemed to believe that Dr. Barnes was essentially making up her testimony as she went along, despite the fact that the personality profile and neonaticide patterns Dr. Barnes discussed and the terminology she used were supported by years of research, much of which was listed in the expert report that she provided to the court. *See, e.g.*, Amon, Putkonen, Weizmann-Henelius, et al., *Potential Predictors in Neonaticide: The Impact of the Circumstances of Pregnancy*, 15 Archives of Women's Mental Health 167, 168 (2012) ("[N]early all studies concerning neonaticide have documented a near total lack of prenatal care, which has been explained by the denial and/or concealment of pregnancy. * * * [T]herefore, concealment and denial of pregnancy describe the same phenomenon with different intensities of the defense mechanism"). A personal disbelief of research is not an objective basis for discrediting an expert witness. In fact, the trial court never indicated that its findings were based on any of the accepted indicators for making a credibility determination—i.e., demeanor, gestures, voice inflections, or other observations of Dr. Barnes. *See Amburgey*, 33 Ohio St.3d at 117, 515 N.E.2d 925. Rather, the findings the trial court did make concerning Dr. Barnes were immaterial as to her credibility and demonstrated the court's fundamental misunderstanding of neonaticide.

{¶ 41} Not only did the trial court misunderstand the evidence pertaining to neonaticide and pregnancy-negation syndrome, but it demonstrated a willful refusal to consider such evidence. This is illustrated by the trial court's cavalier attitude toward the subject of neonaticide and the experts in that field, in conjunction with the trial court's misunderstanding of the subject and its hurried decision from the bench. Once Dr. Barnes finished testifying and was no longer available, the trial court openly questioned whether she was biased due to "her own experiences" with

postpartum depression, a completely different condition from pregnancy-negation syndrome and neonaticide.  The trial court also stated that Dr. Barnes "has made her career in this area of law—or I don't know, it's not law.  But I see the previous expert had her Ph.D. in American Studies *so at least* in this case it was in Psychology.  But she's not a medical doctor."  (Emphasis added.)  After offhandedly dismissing Dr. Lewis's credentials, the trial court next suggested that Dr. Barnes did not understand what neonaticide is: "Obviously, [Weaver's trial counsel] was familiar with neonaticide.  [Dr. Barnes] *wants* to call it pregnancy denial in her opinions."  (Emphasis added.)

{¶ 42} We find that the trial court's decision demonstrated its *arbitrary* disregard of Dr. Barnes's uncontradicted expert opinion.  Furthermore, the trial court's decision was based on an unfounded and capricious credibility determination and "an arbitrary, unreasonable attitude toward the evidence before [it]," *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 74.

{¶ 43} The state and amicus contend that several other exchanges during the hearing support the trial court's credibility determination of Dr. Barnes, including (1) that she had submitted in her report an "incomplete and misleading" statistic on the occurrence of pregnancy concealment and pregnancy denial, (2) that she had testified in 22 cases, but never for the state, and (3) that she had received her certification in "perinatal mood disorders" only in the last month because that certification had not existed prior to that.  But Dr. Barnes made clear that she had never testified for the state because she had never been asked to.  Additionally, the fact that certification in "perinatal mood disorders" did not exist at the time of Weaver's sentencing bears little relevance to Dr. Barnes's credibility, because Dr. Barnes testified that she has been "doing this for almost 25 years" and the term neonaticide was "first coined in 1969."

{¶ 44} And Dr. Barnes did not place a "wrong" statistic in her report, as the trial court stated.  The trial court stated: "The facts and statistics put in there are

wrong. She acknowledged that they were wrong. They didn't fit this case. The higher fact of one out of every 2,500 is after they've been pregnant for at least 22 weeks. And in this case, it was 30 some weeks. So the wrong statistic was put in there to begin with." Dr. Barnes noted in her report that "[o]ne in 475 pregnancies are concealed/denied." During cross-examination, the state asked Dr. Barnes whether this statistic was accurate. Dr. Barnes confirmed it was. The state then asked her whether there were any parameters on that statistic. Dr. Barnes explained that the "parameters are by 20 weeks, one in 475 pregnancies are concealed or denied" and that after 20 weeks, it is "one in 2,500." Not only did Dr. Barnes never acknowledge that the statistic was "wrong," as the trial court represented, but she later explained that the reason she did not find it important to place the specific parameters in her report was because "the issue is not the number of pregnancies," but rather "what occurs as a result of the concealment or denial"—i.e., the act of neonaticide. Regardless, even if the trial court's characterization of Dr. Barnes's testimony were accurate, placing a "wrong" statistic in a report does not alone justify the trial court's complete disregard of Dr. Barnes's testimony on neonaticide. This is especially true considering the other insufficiencies of the trial court's decision; namely, its reliance on immaterial information, its misunderstanding of neonaticide, and its conduct during the hearing, which is described more fully below, all of which demonstrate the trial court's consistent and unreasonable attitude toward the evidence.

### 2. The trial court inappropriately examined lay witnesses

{¶ 45} The trial court's arbitrary and unreasonable attitude toward the evidence during the hearing is further demonstrated by its utterly inappropriate questioning of the state's witnesses. Keeping in mind that the sole purpose of the evidentiary hearing was to determine whether Weaver's counsel was ineffective for failing to present evidence concerning neonaticide as a mitigating factor, the state—

instead of calling its own expert on the subject of neonaticide—chose to proffer the testimony of Weaver's sorority sisters.

{¶ 46} During Weaver's evidentiary hearing, the trial court focused on the following statements that had been made by Dr. Lewis and quoted by the court of appeals in *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766, at ¶ 12:

> Birth takes hours. It is a painful and noisy process. Doing it alone, in silence, in a shared bathroom speaks to [Weaver's] abject terror, as well as to her belief that she had no one she could trust. Anyone might have averted this outcome by offering to help. Instead, she was left alone.

Inexplicably, the trial court asked two of Weaver's sorority sisters for their personal opinions regarding Dr. Lewis's belief that help from someone during Weaver's pregnancy might have "averted this outcome." Not only are the sorority sisters' opinions as to that statement wholly irrelevant for determining the ultimate issue of ineffective assistance of counsel, but the questioning demonstrates the trial court's consistent attempt to base its decision on a personal and emotional view of Weaver's actions rather than an impartial review of the evidence.

{¶ 47} Perhaps even more outrageous is the fact that the court asked one of the sorority sisters whether she had believed that Dr. Lewis's statement indicated that she and her sorority sisters were "personally responsible." When the witness responded, "Yeah," the trial-court judge retorted, "That's the way I think the [court of appeals] took it that sent this back." The trial-court judge's personal opinion of the court of appeals' decision and the suggestion to a witness that the court of appeals may have felt that the sorority sisters were responsible have no place in a proceeding by an impartial tribunal.

### 3. *The trial court unreasonably denied Weaver's ineffective-assistance-of-counsel claim*

{¶ 48} In its entry denying Weaver postconviction relief, the trial court not only failed to cite the long-established test from *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, but it provided a cursory and unreasonable analysis as to why Weaver's counsel was effective. To establish ineffective assistance, Weaver must show (1) that counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced Weaver, i.e., that there is a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *See id.* at 687-688; *see also State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Weaver is able to establish each prong of the ineffective-assistance analysis.

{¶ 49} In this case, the trial court's entry stated that the court would "not accept [Dr. Barnes's] testimony as indicating that the defense counsel in this case was deficient for not presenting the information of neonaticide," because counsel was "obviously" familiar with neonaticide and "presented the fact that it does exist." The entry further stated, "Did [Weaver's trial attorney] throw in statistics and that sort of thing? No. And it would not apply unless you have the statistics that would give you what people convicted of aggravated murder and went [sic] to trial, plea negotiations, and everything else." Beyond the utter incoherence of that statement, the trial court failed to articulate why statistics were needed before Weaver could be found to fit the personality and demographic profile of pregnancy-negation syndrome and neonaticide. The trial court also failed to articulate what statistics would be necessary in a case involving neonaticide.

{¶ 50} Indeed, defense counsel's familiarity with the subject of neonaticide was never in question. Counsel allegedly performed deficiently for failing to explain neonaticide and its applicability to Weaver's case. Specifically, defense

counsel failed to (1) define the term "neonaticide" for the trial court, (2) explain the social and cultural causes of neonaticide and provide a personality and demographic profile of women who commit this act and the pattern of behaviors that are typical leading up to the crime, and (3) describe how Weaver and her actions fit into this profile and pattern, thereby contextualizing her actions as those of extreme panic rather than premeditation. Counsel did nothing more than mention the term "neonaticide."

{¶ 51} Dr. Barnes's testimony illustrated how necessary it was for pregnancy-negation syndrome and neonaticide to be explained before Weaver's sentencing hearing. As the court of appeals emphasized in *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766, at ¶ 31, "[t]he affidavit and report * * * submitted with [Weaver's] petition for postconviction relief explained the psychiatric and cultural issues surrounding neonaticide far beyond counsel's casual mention at the sentencing hearing, and provided information to contextualize the same actions which the court used to support the sentence of life without possibility of parole." Rather than acknowledge the court of appeals' concerns, the trial court found counsel's performance not to be deficient based on its own arbitrary disregard of Dr. Barnes's testimony and the fact that counsel simply "presented the fact that [neonaticide] does exist." That is not an objective standard by which to measure a counsel's performance.

{¶ 52} We cannot conceive of any "reasonable professional judgment" that counsel might have exercised here by merely mentioning neonaticide, but not providing any context or potential impact of it at Weaver's sentencing, especially in light of the two uncontradicted experts Weaver provided in the postconviction proceedings, who each have opined that Weaver's case fits into the classic personality and demographic profile of women who commit neonaticide and that her actions were consistent with neonaticide patterns. There is no evidence in this record suggesting that counsel made a strategic decision not to introduce detailed

evidence of neonaticide as mitigating evidence. *See Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (evaluating whether "the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*" [emphasis sic]). Accordingly, we find that Weaver's trial counsel's failure to present evidence of neonaticide for the purpose of mitigating her culpability constituted deficient performance.

{¶ 53} Next, we must review the prejudice prong of the analysis. When assessing prejudice, a court determines whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* Accordingly, Weaver must demonstrate that had she presented testimony of pregnancy-negation syndrome and neonaticide during her trial and sentencing hearing, there is a reasonable probability that she would have received a sentence other than life in prison without the possibility of parole.

{¶ 54} The trial court's entry does not specifically address the prejudice prong of the *Strickland* analysis. The entry states: "The offense becomes a life sentence based upon the age of the victim. You can't get any younger than the victim in this case. And you couldn't have tried more times to kill this child than [Weaver] did throughout the nine months she was pregnant. That was the Court's finding at that point in time. It's still the Court's finding at this time. And the attorney did the best he could." We interpret these statements as the court finding that defense counsel's performance was not prejudicial. But the findings were made because the trial-court judge *personally* would not have credited the evidence of neonaticide when determining Weaver's sentence and, therefore, this evidence would not have changed the *trial-court judge*'s mind regarding the life-without-parole sentence that he had imposed on Weaver.

{¶ 55} But "the test for prejudice is an objective one." *White v. Ryan*, 895 F.3d 641, 670 (9th Cir.2018), citing *Strickland* at 695. This means that any finding pertaining to the prejudice prong of the analysis "should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.' " *Hill v. Lockhart*, 474 U.S. 52, 60, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), quoting *Strickland* at 695. We therefore do not find the trial court's statements in the entry denying Weaver's petition for postconviction relief to be conclusive that evidence of neonaticide would not have made any difference with Weaver's sentence. *See Hall v. Washington*, 106 F.3d 742, 752 (7th Cir.1997) (holding that even when the judge who presided over the petitioner's original proceeding finds in a postconviction proceeding that the petitioner's "additional evidence would not have changed his mind," that finding is not a "conclusive" finding, because the evidence is "subject to the 'unreasonableness' review").

{¶ 56} Had Weaver's counsel presented evidence pertaining to neonaticide, the trial court would have learned that there is a specific personality and demographic profile of women who commit neonaticide and that, as testified to by Dr. Barnes, it is "not considered a premeditated act," but rather an act "within the context of extreme panic." The court would have also learned that women with pregnancy-negation syndrome distance themselves psychologically from the pregnancy and, as stated by Dr. Lewis in her report, may respond to the birth of the baby with "poorly concealed acts of desperation."

{¶ 57} The trial court would have also learned the specific details that allegedly placed Weaver into the personality and demographic profile of women who commit neonaticide—i.e., (1) that Weaver was young and immature and she continually negated her pregnancy to the point that her body responded with fewer physical signs of pregnancy and (2) that the circumstances surrounding her offenses—i.e., that her birthing experience began with the mistaken belief that she was having a bowel movement, that she had the baby alone in her sorority-house

bathroom, and that she was detached during and after the birth—aligned with a more general pattern of cases involving neonaticide. And the trial court would have been able to weigh this evidence against the state's argument at sentencing that Weaver lacked genuine remorse both at the time she committed the offenses and during the investigation, that her relationship with the victim (the baby) had facilitated the offenses, and that there were "no grounds to mitigate" Weaver's conduct.

**{¶ 58}** The evidence detailed throughout this opinion provides a compelling narrative that could have framed Weaver's actions not as premeditated, but those of desperation and panic from an immature and isolated young woman. As explained by Oberman in her article *Mothers Who Kill: Coming to Terms with Modern American Infanticide*, there are several cases involving neonaticide in which the defendants received significantly lighter sentences than Weaver. 34 Am.Crim.L.Rev. at 91-98 (providing neonaticide statistics regarding the varying sentences imposed for women convicted of similar crimes who fit within the personality profile of those who commit neonaticide, including one woman who was convicted of second-degree murder and sentenced to probation with counseling). Although we express no view on whether this evidence indeed *should* result in a reduction of Weaver's sentence, we conclude that there is a reasonable probability that her sentence would have been different but for defense counsel's deficient performance. *See Rompilla v. Beard*, 545 U.S. 374, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 ("the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing").

### C. Judicial bias

**{¶ 59}** The trial-court judge's conduct detailed throughout this opinion not only demonstrates his arbitrary and unreasonable attitude toward the evidence

before him, but also demonstrates that the trial-court judge had " 'a fixed anticipatory judgment' " regarding Weaver's sentence. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus. It is settled law that a criminal proceeding before a biased judge "is fundamentally unfair and denies a defendant due process." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Judicial bias has been described as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *Pratt* at paragraph four of the syllabus. Although "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" and "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases" ordinarily do not constitute a basis for bias, if those judicial opinions or remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible," judicial bias is demonstrated. *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

{¶ 60} Weaver was entitled to have her petition for postconviction relief heard and decided by an impartial tribunal. *See Moore v. State*, 118 Ohio St. 487, 161 N.E. 532 (1928), paragraph one of the syllabus. The trial-court judge's conduct extensively detailed throughout this opinion illustrates that he was not impartial at Weaver's evidentiary hearing. The trial-court judge willfully refused to consider the evidence of neonaticide and chose to focus on irrelevant information to deny her petition, including inserting his personal opinion of the court of appeals' decision in *Weaver II*, 2018-Ohio-2509, 114 N.E.3d 766, and inappropriately

solicitating Weaver's sorority sisters' feelings toward that decision. Also, in the entry denying Weaver's petition for postconviction relief, the trial-court judge stated: "There was a previous one of these types of cases in this county three or four years before. It happened on the same street that this one happened, that there was a different charge, a different sentence much lighter than this sentence." The trial-court judge never clarified the significance of this previous case, but his flippant reference to it and subsequent departure from that reference suggests that the trial-court judge found that previous case to be personally distasteful.

{¶ 61} In lieu of a proper legal analysis, the trial-court judge made dismissive statements about Weaver that did not pertain to the issue at hand: "The Court is required to sentence based upon what [Weaver] is convicted of and taking anything else [into] mitigation, age, *this, that, and the other*, prior history, she had none." (Emphasis added.) The trial-court judge concluded by echoing the same facts, sometimes verbatim, that supported his decision at Weaver's original sentencing to impose a sentence of life without parole. Specifically, at the original sentencing hearing, the trial-court judge stated: (1) "You can't get any younger than this victim," (2) "It's aggravated murder based upon the age of the victim," and (3) "[W]hat I find in this case is that for a number of months, you tried over and over to take that baby's life." Likewise, in denying Weaver's petition for postconviction relief, the trial-court judge stated: "The offense becomes a life sentence based upon the age of the victim. You can't get any younger than the victim in this case. And you couldn't have tried more times to kill this child than she did throughout the nine months she was pregnant. That was the Court's finding at that point in time. It's still the Court's finding at this time." These statements indicate that the trial-court judge wanted to punish Weaver not only for the offenses with which she was charged, but for her behavior throughout her pregnancy, which he found to be personally reprehensible.

**{¶ 62}** When the trial-court judge's conduct and statements from Weaver's evidentiary hearing are viewed together and against the backdrop of the same trial-court judge's original sentencing of Weaver, his denial of Weaver's petition for postconviction relief without an evidentiary hearing, and his expressed frustration with the court of appeals for reversing that decision, it is clear that he did not hold an "open state of mind," *Pratt*, 164 Ohio St. 463, 132 N.E.2d 191, at paragraph four of the syllabus, toward Weaver's petition for postconviction relief but rather viewed it with a "fixed anticipatory judgment," *id*., and had already decided that Weaver was going to serve a prison sentence of life without parole. This glaring denial of due process can only be remedied by a new sentencing proceeding that is conducted in conformity with the Constitution. The issue regarding the trial-court judge's bias against Weaver will not be remedied by this court remanding this case to that same trial-court judge for a new sentencing hearing at which Weaver would bear the burden of establishing the existence of mitigating evidence and at which the presiding trial-court judge has previously demonstrated a fixed anticipatory judgment regarding Weaver's sentence. *See Harvard v. Florida*, 459 U.S. 1128, 1136, 103 S.Ct. 764, 74 L.Ed.2d 979 (1983) (Marshall, J., dissenting); *see also In re I.R.Q.*, 8th Dist. Cuyahoga No. 105924, 2018-Ohio-292, ¶ 26 (remanding the case to the trial court with instructions that a different judge be assigned to adequately protect the appellant's due-process rights on remand).

### III. CONCLUSION

**{¶ 63}** For the foregoing reasons, we reverse the judgment of the Fifth District Court of Appeals and remand the cause to the trial court for a new sentencing hearing and for assignment to another trial judge of that court.

Judgment reversed

and cause remanded.

_____

DONNELLY, STEWART, and BRUNNER, JJ., concur.

DEWINE, J., dissents, with an opinion joined by KENNEDY and FISCHER, JJ.

_____

**DEWINE, J., dissenting.**

{¶ 64} A majority of this court rejects the credibility determinations of the judge who presided over Emile Weaver's postconviction-relief hearing, concluding that the judge displayed bias against Weaver and consequently violated her due-process rights. Yet rather than remand for a different judge to hold a new evidentiary hearing on Weaver's petition for postconviction relief, the majority determines to reach the merits of her petition here. Then, applying its own view of the evidence, the majority second-guesses the strategy employed by Weaver's original attorney and concludes that he provided constitutionally deficient representation to Weaver during her sentencing hearing. It, thus, vacates her sentence and orders that she be sentenced anew.

{¶ 65} I disagree with the majority's characterization of some of the judge's findings after the postconviction-relief hearing and with its determination that the judge's comments during the hearing show that he was biased against her. Moreover, even if we were to fully credit the evidence presented by Weaver in support of her petition for postconviction relief, that evidence still fails to establish that she was deprived her constitutional right to the effective assistance of counsel. I therefore dissent from the majority's judgment vacating her sentence and remanding for a new sentencing hearing.

**Weaver has failed to demonstrate ineffective assistance of counsel**

{¶ 66} In 2015, Weaver gave birth to a baby in a bathroom in the sorority house where she lived. She placed the baby in a trash bag and took the bag to an outside garbage can, where the body was later discovered by her housemates. A jury found Weaver guilty of aggravated murder, abuse of a corpse, and tampering with evidence. The court sentenced her to life without parole.

{¶ 67} Weaver filed a petition for postconviction relief, asserting that her attorney was ineffective for not presenting evidence at the time of her sentencing to explain the circumstances that contribute to the crime of neonaticide. (Neonaticide is a term that describes the act of killing one's baby within the first 24 hours of life.) The trial court denied the petition for postconviction relief after an evidentiary hearing. This case involves an appeal from that decision.

{¶ 68} To establish a claim of ineffective assistance of counsel, Weaver was required to show that her trial attorney's representation was deficient and that she was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To meet the deficient-performance prong of the test, the petitioner must show that " 'counsel's representation fell below an objective standard of reasonableness.' " *Harrington v. Richter*, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), quoting *Strickland* at 688. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance," *id*., quoting *Strickland* at 689, and the petitioner will overcome that presumption only by showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id*., quoting *Strickland* at 687.

{¶ 69} Weaver asserted in her petition that her trial attorney's performance was deficient because he "failed to identify, introduce, or admit any evidence at sentencing regarding" the incidence of neonaticide. The majority agrees, struggling to find any justification for counsel's decision not to present evidence on the topic of neonaticide at sentencing. But when we actually look at the record, the reason for the decision is fairly obvious: Weaver's primary defense at trial was that she hadn't killed the baby.

{¶ 70} At trial, Weaver testified that she had been lying to her friends and family about not knowing that she was pregnant. She explained that she had been

"too scared" to tell her mom about her pregnancy. And she recounted that her friends were gossiping about another college student that had gotten pregnant, and she "didn't want to be that person" that they talked about.

{¶ 71} Weaver conceded that she was guilty of abuse of a corpse and tampering with evidence based on the manner in which she disposed of the baby's body. But she consistently denied having intentionally suffocated the baby. Instead, she claimed that the baby died of natural causes shortly after birth, before Weaver placed her inside the garbage bag.

{¶ 72} The defense maintained this position in closing arguments. Additionally, the defense suggested that even if Weaver had been mistaken in her belief that the baby had already died, Weaver was at most guilty of reckless homicide based on her failure to seek medical attention for the child.

{¶ 73} The evidence presented at Weaver's postconviction hearing supported a theory that she experienced a clinical syndrome known as pregnancy negation, which causes expectant mothers to fail to perceive that they are pregnant and elevates the risk that they will commit neonaticide. The majority criticizes defense counsel for raising the issue of neonaticide at sentencing without providing evidence that Weaver experienced a negated pregnancy. But this misunderstands the reason that counsel discussed neonaticide in the first place. Defense counsel did not raise the issue to explain Weaver's actions or to diminish her culpability for the offense. Rather, defense counsel referred to neonaticide in support of his argument that a severe prison sentence would be unlikely to deter others from committing the same crime.

{¶ 74} Evidence that Weaver had been experiencing pregnancy negation might have provided an explanation for Weaver's perceptions and behavior before and after the birth of her child. But that is not the defense that counsel employed at trial. In reviewing Weaver's ineffective-assistance claim, the majority looks at the sentencing hearing in isolation, rather than in the context of the entire trial. As

a result, the majority holds that counsel was ineffective for failing to present *an entirely new theory* of the defense during sentencing—one that would have required a concession of factual guilt when his client still intended to challenge her convictions on appeal. That is the height of Monday-morning quarterbacking.

{¶ 75} Expecting counsel to change the defense's entire theory of the case at sentencing is, by itself, a tall order. But here, the majority demands even more. It says defense counsel should have presented evidence at sentencing undermining Weaver's own testimony at trial. And the evidence the majority expects defense counsel to have provided includes expert assessments of Weaver's case, like those presented in support of her postconviction-relief petition. So the majority would apparently have had defense counsel subject Weaver to interviews to assess whether she was in a state of pregnancy negation at the time she killed her baby— even though she testified under oath that she hadn't killed the baby. Defense attorneys across the state, take heed.

### Conclusion

{¶ 76} For all the time the majority spends criticizing the trial judge's findings, its own review of Weaver's ineffective-assistance-of-counsel claim is cursory and incautious. Because Weaver has failed to demonstrate that her trial attorney performed deficiently, I would affirm the judgment of the Fifth District Court of Appeals upholding the trial court's judgment denying Weaver's ineffective-assistance claim brought in her postconviction-relief petition.

KENNEDY and FISCHER, JJ., concur in the foregoing opinion.

_____

Ronald L. Welch, Muskingum County Prosecuting Attorney, and Taylor P. Bennington, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Rachel Troutman, Michelle Umaña, and Renee Monzon, Assistant Public Defenders, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Zachery P. Keller, Deputy Solicitor General, urging affirmance for amicus curiae, Attorney General Dave Yost.

_____