[Cite as *Marlowe v. Marlowe*, 2023-Ohio-1417.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Christopher Marlowe, Jr.                    Court of Appeals No.  WD-22-063

    Appellee                                Trial Court No.  2018 DR 0147

v.

Jennifer Marlowe                            **DECISION AND JUDGMENT**

    Appellant                               Decided:  April 28, 2023

* * * * *

Elizabeth B. Bostdorff and Frederic E. Matthews, for appellee.

Martin E. Mohler and Theodore B. Tucker, III., for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Jennifer Marlowe, appeals the September 9, 2022 judgment of the Wood County Court of Common Pleas, Domestic Relations Division, granting her and appellee, Christopher Marlowe, a divorce and designating Christopher as the residential parent and legal custodian of the parties' minor children.  Because the trial court did not

abuse its discretion by determining that custody with Christopher was in the children's best interests, we affirm the trial court's decision.

## I. Background and Facts

{¶ 2} Christopher and Jennifer were married in 2011 and have two minor children together: W.M. ("child 1") and B.M. ("child 2"). In August 2018, Jennifer took the children (then ages 4 years and approximately 8 months) and moved out of the family's home in Perrysburg. Approximately one month later, Jennifer moved to Florida with the children, where she established a residence with her boyfriend, Denis Waibel. Jennifer left the home and took the children without giving any notice to Christopher.

### A. The emergency hearing

{¶ 3} In November 2018, after Jennifer moved to Florida, Christopher filed his complaint for divorce and an emergency motion for custody of the children. On November 9, 2018, the magistrate granted an emergency ex parte temporary order giving Christopher custody and Jennifer supervised visitation.

{¶ 4} Three weeks later, the magistrate held a hearing on the emergency motion. At the hearing, Christopher presented the testimony of Heidi Strobel, an investigator from Wood County Job and Family Services ("JFS"), and testified in his own behalf. Jennifer presented the testimony of Susan Greener, her mother, and testified in her own behalf.

#### 1. Strobel's testimony

{¶ 5} Strobel testified about a report of abuse that Jennifer made in March 2018. Jennifer reported concerns about Christopher being physical with child 1. When Strobel

2.

interviewed child 1—who was four years old—he said that Christopher had pulled his hair and "punched him in the nuts." Strobel described her conversation with child 1 as "a very difficult interview * * *." During Strobel's interview with Jennifer, Jennifer denied any domestic violence in the home.

{¶ 6} When Strobel interviewed Christopher, he was emotional and upset about the allegations. He denied punching child 1. He admitted that he had pulled child 1's hair to "get his attention" because child 1 had hurt child 2—who was only a couple of months old—and had "forcefully pull[ed]" child 1 out of the car because he wasn't listening. In her notes, Strobel recorded that Christopher said that he pulled child 1's hair and pulled him from the car as disciplinary measures, not to hurt him. Christopher was receptive to Strobel's suggestions and said that he wanted to be a better parent.

{¶ 7} Strobel suggested that child 1 attend counseling and Christopher get an assessment. Jennifer also required that Christopher have no unsupervised contact with the children. When Strobel followed up with the family about a month later, JFS decided to close the case because the parties had followed through with her recommendations and Jennifer seemed able and willing to protect the children, if necessary. Strobel described the case as an alternative response case, so it did not result in a finding regarding Christopher's treatment of child 1. She did not elevate the case from an alternative response to a traditional response case because she "didn't have a preponderance of evidence to show the concerns to be true." She also said that she had no further contact with the family after sending them a letter closing the case.

3.

## 2. Christopher's testimony

{¶ 8} During his testimony, Christopher said that he filed his motion for emergency custody because he had not seen his children for months and had not "even had a chance to talk to them * * *." Although Christopher and Jennifer occasionally spoke on the phone, Jennifer had not cooperated in allowing Christopher to speak with the children.

{¶ 9} Christopher and Jennifer had talked about moving to Florida, but Christopher was against it because both parties had family in Ohio. According to Christopher, Jennifer moved while he was in the hospital on two occasions in September. The first time Christopher was hospitalized, Jennifer told him that she had cleaned things out of their condo because someone was interested in purchasing it. The second time Christopher was hospitalized, Jennifer told him to look at houses that they could buy. None of the houses was in Florida. As part of the house hunting, Jennifer told Christopher that she needed money for a down payment. Christopher wrote a check from his account, but Jennifer did not use the money to purchase a home for the couple. When Christopher realized that Jennifer was in Florida, he stopped payment on another large check written on the account.

{¶ 10} When Jennifer left for Florida, she told Christopher that she had left the parties' vehicles near Perrysburg, but forgot to leave the keys, and that someone had mailed Christopher's keys to him. Christopher discovered Jennifer's Florida address when an identity-theft-monitoring company informed him that his address had been

4.

changed. He believed that mail forwarding began on September 1, despite Jennifer not moving to Florida until early October. He also claimed that Jennifer had thrown his diabetes supplies in the trash. When he retrieved them from the dumpster, he put them in the garage, where they remained when he went to the hospital for the second time in September. While he was in the hospital, he asked Jennifer to bring the supplies from the house, but she claimed that the supplies were "locked in a trailer and that she had lost the keys."

{¶ 11} The parties' health conditions came up during Christopher's testimony. Initially, Jennifer told him that she went to Florida for a job interview, but then said that she was there for cancer treatment. Christopher did not recall Jennifer providing any details about her cancer or treatments beyond telling him that she had "stage IV cancer and * * * she was getting chemo at this time." He offered to come to Florida and asked Jennifer to come home so that he could help care for her and the children. Jennifer told him that the children went somewhere in the hospital while she received her treatments, but she never mentioned hiring babysitters or enrolling child 1 in school.

{¶ 12} Christopher has type 1 diabetes, which required insulin injections. When he attempted to refill his prescription after Jennifer moved, he learned that his health insurance through Jennifer's employer was terminated effective September 30. However, at that time, Jennifer told him that she was still employed at her job in Ohio. He did not believe that his diabetes (and any resulting low-blood-sugar incidents) would endanger the children because he checked his blood sugar regularly.

5.

{¶ 13} Regarding his knowledge of Jennifer's relationship with Waibel, Christopher said that he knew Jennifer and Waibel were "texting back and forth * * *" when Jennifer was pregnant with child 2, but Jennifer told him that the relationship was over. However, Christopher later saw that Waibel "was still on [Jennifer's] phone." Christopher had also seen "insurance bills" in Waibel's name that were mailed to Christopher and Jennifer's address. When Christopher asked Jennifer about the bills, Jennifer's "response was that they're fake. She doesn't know how this can be. They must be fraud * * *."

{¶ 14} Christopher denied ever beating Jennifer or the children, sexually assaulting child 1, and denying the children food and medical care. Regarding Strobel's investigation, Christopher claimed that he cooperated with Strobel, and was not questioned about domestic violence concerns. He was "flabbergasted" by the JFS investigation because he "would never hurt [child 1]." However, Christopher did admit to removing child 1 from the car "too roughly." He was never contacted by the Florida Department of Children and Families ("DCF").

{¶ 15} Christopher was concerned about the children because he did not know who they were with in Florida and did not know that Jennifer was living with Waibel until her testimony at the emergency hearing. He was also concerned about the children not having any family in Florida, although he admitted on cross-examination that Jennifer had several relatives who lived there. He claimed that he did most of the parenting when the children and Jennifer lived with him.

6.

**{¶ 16}** Christopher testified that he had contacted daycare centers and potential babysitters for the children, had contacted child 1's preschool about reenrolling him, looked into kindergarten registration, informed his employer of the situation, and removed all guns from his home so that he would be prepared for the children if he received custody. He told the magistrate that he wanted Jennifer and the children to have a relationship. To facilitate that, he would allow Jennifer to talk to them, and "if [he] felt like they would be returned, [he] would let them go visit her." He also wanted the children to have relationships with extended-family members—both his and Jennifer's— if they returned to his custody. He felt that Jennifer had not ensured that he was able to have a relationship with the children since she moved.

### 3. Jennifer's testimony

**{¶ 17}** When Jennifer testified, she said that Christopher was a hoarder and their house had been "very filthy [and] disgusting." She felt that the children were not safe in the home, so she left. She also claimed that Christopher had begun "using very strange behaviors, * * *" such as saying that people were trying to kill him. On one occasion, Christopher threatened to kill himself, took a bottle of insulin, and locked himself in the bathroom. Jennifer saw that the bottle was not empty when Christopher came out of the bathroom. Additionally, Jennifer recalled that there were "two very strange house fires * * *" that happened when Christopher was the only person home. She also alleged "[m]ultiple" instances of domestic violence.

7.

{¶ 18} Jennifer had several safety concerns about Christopher. First, she said that Christopher had "multiple weapons" and ammunition in the house, and that child 1 had handled both weapons and ammunition. Next, Christopher also had needles for his insulin injections, and left "used needles all over the house, as well as unsecured medications." Jennifer said that there were times when child 1 took Christopher's medicines, "[a]nd if [she] had not been paying attention, he would have injected himself." Jennifer said that on "multiple occasions" Christopher had "locked [the children] in their rooms * * *" so that he could play videogames in the basement. Jennifer found "used food articles as well as 2-liter bottles full of urine * * *" around Christopher's computer and said that child 1 had come in contact with those things. Jennifer also alleged that Christopher denied child 1 reasonable medical care, physically abused him, and refused to feed him. She claimed that Christopher's behavior had "been escalating" since JFS closed its case, but Jennifer did not call JFS again.

{¶ 19} According to Jennifer, she and Christopher had discussed moving to Florida because Jennifer had a "substantial" job offer. Jennifer claimed that Christopher was aware that she was moving to Florida with the children. They had "several conversations about it" and Christopher did not initially disagree with Jennifer's decision; he began disagreeing with it after his mother visited Jennifer and the children in Florida. When she moved, Jennifer and Waibel took both of the parties' cars because she "just wanted leverage for the divorce * * *." Jennifer did not recall Christopher calling to talk to the children since she had moved to Florida.

8.

**{¶ 20}** In Florida, Jennifer lived with the children, Waibel, and Waibel's two children. She had known Waibel for approximately two and one-half years, but first met him in person the year before she moved to Florida. Jennifer also said that she had thyroid cancer, which was being treated in Florida. The availability of treatment in Florida played into Jennifer's decision to move.

**{¶ 21}** Consistent with Strobel's recommendation, Jennifer took child 1 to counseling, both before and after moving. Jennifer reported that child 1's Florida counselor was concerned with some of the things that child 1 said in his sessions, so she referred them to a hospital for an interview; following that interview, someone from the hospital called DCF. This happened shortly before the date of the emergency hearing.

### 4. Greener's testimony

**{¶ 22}** Greener was the final witness at the emergency hearing. She testified that she had occasionally watched the children since child 1 was born in 2014. The last time she was in the parties' home was early August. At that time, she saw bottles of urine around Christopher's computer, "cases of gun ammunition that took up the whole entire basement floor[,]" and needles in the kitchen. She said that these items "were always there."

**{¶ 23}** Greener calls Jennifer every day and was aware of Jennifer's move to Florida. She was also aware of Jennifer's cancer diagnosis, but did not know if Jennifer was receiving cancer treatments in Florida. She believed that Jennifer had bowel cancer.

9.

### 5. December 2018 and January 2019 temporary orders

{¶ 24} At the end of the emergency hearing, the magistrate vacated the November temporary order awarding temporary emergency custody without providing any reasoning. In orders issued on December 12, 2018, and January 15, 2019, the magistrate vacated the November 2018 temporary order, designated Jennifer as the temporary residential parent and legal custodian of the children, and issued a temporary parenting time schedule for Christopher.

## B. The final hearing

{¶ 25} On May 18 and 19, 2021, the magistrate held a final divorce hearing. Before the hearing, Christopher and Jennifer resolved all issues except custody and child support.

{¶ 26} At the hearing, Christopher presented the testimony of his brother, Christian Marlowe; his mother, Christine Marlowe; his girlfriend, Rachel Taylor; his neighbor, Joyce Williams; lieutenant Richard Cartwright of the Perrysburg Police Division ("PPD"); and the guardian ad litem ("GAL"), Brian Smith. He also testified in his own behalf. Jennifer presented the testimony of Greener and the children's former babysitter, Janet VanderHorst. She also testified in her own behalf.

### 1. Christopher's witnesses

#### a. Testimony about the parties' interactions with the children and living conditions

{¶ 27} Christian, Christine, Taylor, and Williams testified to the parties' interactions with the children and living conditions.

10.

{¶ 28} Christian said that the children's visits with Christopher were "great" and that Christopher is a "great dad." The children got along well with Christian's sons and appeared to have fun during the visits with Christopher that Christian observed.

{¶ 29} Christian also said that Christopher "did most of the parenting" before he and Jennifer separated, which Christian defined as "taking care of the kids, whether they needed their diaper changed or interacting with them, or playing with them or supervising them." He also said that Jennifer was "present," in the home, "but not as present with the children as Christopher was." According to Christian, Christopher did approximately 75 percent of the parenting and Jennifer did approximately 25 percent. However, he also said that he did not see the family frequently because of the "toxic relationship of them and the way that [Christopher] was treated." He claimed that Jennifer "[y]elled at [Christopher], called [Christopher] names, [and used] inappropriate language in front of the children."

{¶ 30} Although Christian described Christopher and Jennifer's house as "messy," he also said that the mess was not "excessive." He denied seeing bottles of urine, unsecured guns and ammunition, or unsecured hypodermic needles.

{¶ 31} When Christine testified, she said that Christopher was "a good dad" who spends a lot of time with his children, is interested in what they have to say, relates to them, and "goes out of his way to try to make sure the [sic] time together is as enjoyable as he can." She never witnessed Christopher doing anything inappropriate with the children.

11.

{¶ 32} During the parties' marriage, Christine said their house "really was a mess." She did not report seeing bottles of urine, unsecured guns and ammunition, or unsecured hypodermic needles.

{¶ 33} Christine did not have any concerns about Christopher's mental health. She had never heard Christopher express a desire to hurt or kill himself and was only aware of two times when Christopher was in the hospital in the recent past. She also believed that Christopher was open with her about his medical history because she is a nurse and her husband is a doctor.

{¶ 34} On cross-examination, Christine admitted that Christopher had not used all of his available parenting time during a Thanksgiving visit because he could not afford to be in Florida for a full week. Instead of staying in Florida for the full weeklong visit, Christopher went to visit his parents in South Carolina.

{¶ 35} Taylor testified that she had known Christopher for just over two years. She had seen Christopher with the children during his visits and said that he was "very good with them." She never saw him act inappropriately with or physically discipline the children. She had also been present during some of Christopher's phone and video calls with the children and said that child 1 "is really good usually when he's by himself. But when his mother is present, he's more timid and doesn't really express himself like he would if he was by himself." She also said that there were "many calls" that Christopher did not receive when he was supposed to, and, although some phone calls would go on

12.

for an hour or longer, "other calls will be maybe ten minutes before they're abruptly disconnected."

{¶ 36} Taylor said that the condition of Christopher's house was "fine"; although "maybe he has a little pile of clothes, * * *" the house was otherwise clean.

{¶ 37} The final witness who testified about Christopher's living conditions was Williams. First, she testified that Jennifer told her in September 2018 that the parties had sold their condo and would be moving. She also said that she and Christopher were getting a divorce, she had a job in Florida, and she was moving to Florida with the children.

{¶ 38} Williams recalled that, while the parties were living together, the kitchen and patio (the only parts of the house that Williams had observed) were "a mess. The kitchen was a total—everything every place. And the patio was the same. The trash bags were laying out, not in the toters, [sic] just a total mess." Since Jennifer had moved to Florida, those same areas looked better.

### b. Cartwright's testimony

{¶ 39} Cartwright testified that the PPD opened an investigation of physical and sexual abuse of child 1 in June 2019. A call from Jennifer asking about the status of the PPD's investigation of her December 2018 report to DCF prompted the investigation; the PPD did not know about the allegations or have an investigation in progress at the time Jennifer called.

13.

{¶ 40} During his investigation, Cartwright reviewed the file from Florida, spoke with Wood County JFS, and interviewed Christopher. Christopher "categorically denied" physically or sexually abusing child 1. Cartwright forwarded his report to the Wood County prosecutor, who declined to prosecute the case.

### c. Christopher's testimony

{¶ 41} Christopher testified that he and Jennifer separated in late August of 2018 when Jennifer "went to a hotel for the weekend. And then she never really came back." As far as knowing about Jennifer's plans to move to Florida, Christopher said that "[s]he had mentioned wanting to go there, but nothing was definitive." Jennifer initially told Christopher that she was going to Florida for a job interview, but later said that she was there for treatment for "stage IV cancer." Christopher was not aware that Jennifer had been diagnosed with cancer before she moved to Florida. She never mentioned it, he never received any bills or explanations of benefits from his insurance company that referred to cancer treatments for Jennifer, and she did not provide any information requested in discovery regarding her cancer diagnosis. Jennifer did not share information about her treatment with him.

{¶ 42} When she left, Jennifer did not provide Christopher with any information about where she and the children were living and would not let Christopher speak to the children. Christopher offered to come to Florida to help take care of her and the children, but Jennifer refused. After the magistrate granted his ex parte emergency motion for custody of the children, Christopher and Christian went to Florida to get the children, but

14.

the local sheriff's office would not assist him, and he was not able to obtain relief through the Florida courts.

{¶ 43} Christopher discovered that Jennifer was seeing Waibel when a bill in Waibel's name came to Christopher's house in September or October of 2018. Although Christopher was aware that Jennifer and Waibel "had been talking * * *[,]" he did not know how long they had been in a relationship.

{¶ 44} Over the course of the divorce case, Christopher had only brief visits with the children, and did not have any overnight visits until December 2020. He testified to short visits in December 2018, and February, April, and June 2019. Once a new temporary order was signed in September 2019, Christopher was supposed to have visits with the children every other month. He had his scheduled visits in September and October 2019; February, June, October, November, and December 2020; and February and April 2021.

{¶ 45} In December 2019, Jennifer was supposed to bring the children to Ohio for a visit that coincided with a divorce hearing, but the hearing was continued and Jennifer did not bring the children to Ohio. Christopher was unable to schedule a makeup visit that month.

{¶ 46} In April 2020, the parties' scheduled court date was continued because of the COVID-19 pandemic, so Christopher was unable to see the children. He did not go to Florida for a visit that month, either.

15.

{¶ 47} Following the June 2020 visit, Christopher was investigated by DCF based on allegations that he sexually abused child 1.  As a result, he chose not to attend the August 2020 visit because he was afraid of being arrested.  As Christopher explained it, he was worried about arrest "[b]ecause [he] had been accused and investigated by more agencies than [he] (indiscernible) how to explain it."  That list included Wood County JFS, Florida DCF, PPD, the FBI, the Center for Missing and Exploited Children, and the Ohio Attorney General's office.

{¶ 48} In elaborating on some of these investigations, Christopher said that the FBI received a tip that he and Christian were "white supremacist[s] who w[ere] stockpiling weapons for a race war."  Although Christopher admitted to having weapons and ammunition, he denied being a white supremacist or planning a race war.  He also mentioned that he had background checks to purchase his guns and had "never been denied."   After he spoke with the FBI, he "heard that * * * there was no evidence to go forward with * * *" the case.

{¶ 49} He was investigated by the PPD two or three times, most recently in June 2020 for allegedly "taking photos of [the] children in their underwear and that they had bruises that they shouldn't have."  All of the charges against Christopher with the various agencies were unsubstantiated.  It was his understanding that all of the allegations were coming from the same IP address in Florida.

{¶ 50} When Christopher attempted to make up the August 2020 visit over the Thanksgiving holiday in November 2020, Jennifer would not allow him to take the

16.

children to South Carolina to celebrate with his parents. He was able to visit the children for three days in Florida, but did not spend any extra days with them.

{¶ 51} In total, Christopher had only seen the children "about 30 times" over the course of approximately 1,000 days. Christopher also testified that he will not attend visits with the children by himself "to protect [him]self because of all the allegations that have been thrown out." Christian, Christine, and Taylor have each attended visits with him.

{¶ 52} When he had visits with the children, he said that they "go great." The children are excited to see him, "they'll jump in [his] arms and tell [him] that they miss [him], so happy to see [him]." He always plans activities to do with the children and tries to make the visits enjoyable for them. He had not experienced any issues with the children during visits beyond some problems with child 1 using his cellphone. The children have never been sick when Christopher had them, despite Jennifer reporting that "they're sick all the time." Christopher had requested some of the children's medical records, but was told that he is not authorized to access them. He had also emailed with child 1's teacher.

{¶ 53} Christopher would speak to the children on the phone or through video chat three or four times a week. When he spoke to them, they would play games or tell jokes. The calls ranged from around ten minutes to two and one-half hours long. Christopher said that calls would sometimes be cut short because the children were not interested in talking, but sometimes someone—usually one of Waibel's children—would come into

17.

the room yelling at child 1 to get off of the phone or would physically take the phone from child 1. Christopher thought that his calls with the children were occurring while other distractions—including watching television, eating dinner, riding in the car, and playing in a pool—were also occurring.

{¶ 54} Christopher reviewed some of the text messages that he had received from child 1's phone. Although most of the messages were pictures, emojis, or borderline gibberish, some of the messages—primarily related to custody and visitation matters— were much more intelligible and used vocabulary that child 1 did not use when Christopher spoke to him. These messages said things like child 1 did not want to live in or visit Ohio, Christopher could never be late to visits again, and Christopher only visited at Christmastime. Christopher said that child 1 did not bring up these issues when they were together or talking on the phone; these thoughts only appeared in text messages. Christopher also said that child 1 had fun when they were together and seemed to enjoy visits. He concluded that the messages were being sent by someone other than child 1.

{¶ 55} On cross-examination, Christopher admitted that Jennifer had been in compliance with the court orders regarding phone calls and visitation.

{¶ 56} Christopher denied ever beating or abusing the children. He acknowledged that Wood County JFS had investigated him in April 2018 for allegedly pulling child 1 out of the car. On cross, he said that he "helped [child 1] get out of the car[,]" but would not characterize his actions as "pull[ing] him out of the car roughly * * *." JFS closed

18.

the case without any findings. Christopher followed JFS's recommendations that he refrain from physically disciplining the children and obtain a mental health evaluation.

{¶ 57} During the PPD's investigation of the sexual abuse allegation from Florida, Christopher learned that he "was reported deceased during [the] investigation in Florida * * *." He also learned from his doctor's office that a bill was returned to the office with a notation on the envelope that Christopher "is dead!!" Christopher discovered that he was supposedly dead about six months after Jennifer left. His alleged death caused him to have issues obtaining his insulin prescription for one or two months.

{¶ 58} Christopher admitted to having guns and ammunition in the house before the divorce proceedings, but said that he did not leave the guns or ammunition sitting out and always stored the guns and the ammunition separately. He also denied leaving needles sitting around the home. He admitted to occasionally urinating in bottles while he was playing videogames, but said that he "would clean up after [he] was finished." He also admitted to sometimes locking the children's bedroom door when child 1 would not take a nap—but never so that he could play videogames. He said that Jennifer agreed to and participated in locking the door at naptime, and they would unlock the door once child 1 was sleeping, usually about 15 minutes later.

{¶ 59} Regarding his health, Christopher denied having issues with low blood sugar because he was using an insulin pump. The only times he was hospitalized were when he was first diagnosed with diabetes and twice in September 2018. He had never been hospitalized for mental health issues and had never attempted suicide. Christopher

19.

admitted to having suicidal thoughts, but said that the thoughts were "isolated." He explained that "I basically saw my entire world come crashing down. My house was left empty. * * * [A]ll my medical supplies for my diabetes were gone. I didn't have my children. I had basically nothing, and you know, my whole world had just come apart." He sought counseling because of these issues and continued to see his counselor at the time of the hearing.

{¶ 60} Regarding the fires at the parties' home, Christopher said that the first time something happened was when he came home from the hospital in September 2018. He went to sleep, and when he went to the kitchen later on, he saw "an actual candle burning on [his] kitchen table that [he] did not light. And the gas on the stove was actually turned on the lowest setting." Christopher left the doors to the condo unlocked that night because Jennifer said that she might come home. He called the police and made a report about the incident. The second time, about two weeks later, Christopher said that he was awoken by the smoke detector, and when he went downstairs, he found the couch and curtains on fire. He attempted to put out the fire himself, but when he was unable to do so, he called the fire department. Again, Christopher said that Jennifer had asked him to leave the doors unlocked because she might come home that night. After the second fire, police asked Christopher if he would submit to a mental health evaluation. He agreed. He denied having anything to do with either incident.

{¶ 61} Christopher understood that there would be a transition period if he were awarded custody of the children, and he had planned for that transition. Before the final

20.

hearing, Christopher made arrangements to take approximately two weeks off of work if the children moved to Ohio, had an offer from Christine to come help him, talked to his cousin who taught at the school child 1 would attend, found a counselor for child 1, purchased clothing for the children, spoke to daycare centers, contacted the children's former pediatrician, and discussed potential parenting issues that might arise with his counselor. Christopher also said that he would work with Jennifer to set up a schedule of phone calls that would work for both her and the children and intended to foster the children's relationship with Jennifer. Additionally, he planned to allow the children to spend time with Jennifer's relatives who live in the area.

{¶ 62} If the court awarded Jennifer custody of the children, Christopher said that he would consider moving to Florida to be closer to them, although he did not want to because his family was in Northwest Ohio.

{¶ 63} Following his testimony, Christopher rested.

## 2. Jennifer's witnesses

### a. Testimony about the parties' interactions with the children and living conditions

{¶ 64} Jennifer called Greener and VanderHorst to testify to the parties' interactions with the children and living conditions.

{¶ 65} As she did at the emergency hearing, Greener testified that she saw bottles full of urine around Christopher's computer, unsecured guns and ammunition around the house, and "many, many insulin needles laying around." She also said that, when child 1 was approximately two years old, she saw him running with a hypodermic needle that she

21.

believed he had found on the kitchen table. Greener talked to Jennifer about the urine bottles and an unsecured gun, but did not talk to her about the other items or talk to Christopher about any of the items.

{¶ 66} Greener had some concerns about Christopher's methods of disciplining child 1. She said that she saw Christopher "dragging [child 1] by one arm" several times, and, when she discussed the issue with Christopher, suggested that he take parenting classes. Greener did not have any concerns about Jennifer's parenting.

{¶ 67} Greener had visited Jennifer and the children in Florida and met Waibel, and she said that the home was appropriate for the children. Although Greener saw Jennifer interacting with the children many times when they lived in Ohio, she had only visited them once since they moved to Florida. Greener believed that Jennifer was "an excellent mother." She would take the children to the park, take them swimming, and play games with them. She believed that Christopher did not have an appropriate relationship with the children when they lived in Ohio because "[m]ost of the times Chris was on his cell phone either playing games or texting."

{¶ 68} Regarding the parties' health, Greener knew that Christopher had diabetes, and that Jennifer had thyroid cancer and needed a hip replacement. Greener did not know much about Jennifer's thyroid cancer or treatments; she only knew that Jennifer "goes to the doctors." Greener never observed any physical violence between Christopher and Jennifer.

22.

{¶ 69} When VanderHorst testified, she said that she watched the children from the time child 1 was born until August 2018. For approximately 18 months, VanderHorst watched child 1 in the parties' home. She said that the home was "definitely * * * not clean." She also said that she saw insulin needles around the condo and twice saw single bullets sitting on tables. On cross-examination, VanderHorst confirmed that she never saw guns in the house and that the children never went into the basement.

{¶ 70} VanderHorst had visited Jennifer in Florida. She believed that Jennifer's home was an appropriate environment for children. She said that Jennifer was "strict," but "very loving" with the children. She never saw Jennifer physically or emotionally abuse the children. She did not have any concerns for the children's welfare if Jennifer received custody.

{¶ 71} Regarding Christopher, VanderHorst said that, at first, Christopher's interactions with child 1 were "really good." However, after she resumed watching the children following a four-month period when Christopher was not working, she noticed that child 1 "was different." She said that "he was angry all the time. He would bite. He would hit [her] grandson. He'd hit [her]. He'd holler at us. He wouldn't listen. He was just a lot different." VanderHorst brought her concerns to Jennifer, who "asked [VanderHorst] to just notify her any time [child 1] told [VanderHorst] anything." Later, Christopher asked her about the concerns she mentioned to Jennifer. According to VanderHorst, Christopher said to child 1 (in front of VanderHorst) "why did you lie about that? You know I don't do that. You know I never hit you."

23.

{¶ 72} VanderHorst personally witnessed Christopher "take[ child 1] by the arm" and once saw Christopher "take [child 1] by a leg to pull him out of the car when they were running late." Later, VanderHorst explained that Christopher "grabbed [child 1] because [child 1] * * * looked like he was trying to go to the other side of the car * * *. So he just took him by his leg and pulled him out. And when he pulled him out he just kind of, like, hung there * * *. And then Chris put him down so that he could take—and pull him up by his arms so they could come in the house." VanderHorst said that child 1 was crying after this incident. When Christopher's attorney asked if VanderHorst thought these behaviors were abusive, VanderHorst responded "we all take a child by the arm now and then. But when he took him by the leg to pull him out of the car, yeah, I wasn't real happy with it." VanderHorst told Jennifer about the leg-pulling incident.

{¶ 73} Any concerns VanderHorst had about Christopher having custody were based on the things that child 1 told her years before.

### b. Jennifer's testimony

{¶ 74} Jennifer testified that she had always planned on moving to Florida and that she and Christopher "discussed it many times * * *." She finally decided to move out because in the months leading up to her leaving, Christopher's "mental health seriously declined." She said that "[h]e was telling [her] things like people were out to kill him. He was talking about suicide. He was threatening [her] with guns." She recalled one incident when Christopher had locked himself in the bathroom and said that "feigned like he was going to try to kill himself with a bottle of insulin." Child 1 heard Christopher

24.

say that he was going to kill himself. Around the same time, Christopher would tell Jennifer that he thought people were trying to kill him. Additionally, she said that Christopher threatened to commit suicide when Jennifer would tell him that she wanted a divorce or was going to leave him.

{¶ 75} On cross-examination, Jennifer said that she could not remember when she first started dating Waibel, but it was before she and Christopher separated. She also testified that she had been living with him since she moved to Florida in August 2018. Waibel had not been employed the entire time that Jennifer had been with him in Florida, and "frequently" watched the children while Jennifer was at work.

{¶ 76} During her testimony, Jennifer said that she had not missed any of the visits that Christopher was entitled to under the temporary order. She did not miss the visits despite her employer's policy of requiring a two-week, unpaid quarantine following travel during the height of the COVID-19 pandemic. Christopher, on the other hand, attended only one of six visits that he was supposed to make to Florida and had only rescheduled two of the visits. On cross, Jennifer admitted that at least two of the visits that she characterized as "missed" were scheduled for months when Jennifer was supposed to be in Ohio for court dates that she later asked to continue, and one occurred before the temporary order allowing visitation was signed. She also testified that she offered Christopher additional parenting time, but he did not accept her offers, and that he was in Florida for two days in November 2018 without attempting to contact her or the children.

25.

{¶ 77} Jennifer made sure that the children called Christopher three or four times a week, and more frequently if they wanted to. Sometimes, Jennifer would be in the room during phone calls because child 1 walked in with the phone or she was holding the phone so that the children did not argue. She had overheard Christopher telling the children about visits he had not discussed with her, seen Christopher on video chats "[o]n multiple occasions" without clothing on, and seen him on video chats while he was driving.

{¶ 78} Jennifer admitted that the children had missed some phone calls with Christopher, but said that they always called three or four times a week. A call from Father's Day weekend of 2019 was discussed in depth. Although Christopher said that he did not get a phone call on Father's Day, Jennifer explained that child 1 talked to Christopher the day before, and Jennifer told Christopher that they were going to be busy on Father's Day. So, the call on Saturday was Christopher's Father's Day call. She could not recall if Christopher agreed to this arrangement.

{¶ 79} Christopher called Jennifer to testify on cross-examination during his case in chief. During this first cross, when Christopher's attorney asked Jennifer about a series of text messages regarding the Father's Day call, Jennifer could not recall the circumstances under which she did not allow Christopher to talk to the children that day. During her counsel's direct examination of her, however, Jennifer testified that they were at the beach on that particular Father's Day and that her phone did not work at the beach,

26.

so she had discussed with Christopher the day before that the children would not be calling.

{¶ 80} Additionally, Jennifer believed that other text exchanges in which she appeared to be limiting Christopher's contact with the children were "being taken out of context."

{¶ 81} Regarding the text messages from child 1's phone, Jennifer did not know of anyone except child 1 using the phone to text Christopher. She believed that any messages Christopher received had come from child 1.

{¶ 82} Regarding the allegations of abuse by Christopher, Jennifer denied that she ever reported that Christopher was dead or reported him to the FBI. She admitted on cross that she had called the Center for Missing and Exploited Children, but denied reporting him to "Ohio cyber crimes against children[.]" Jennifer could not recall what she reported to Strobel when Strobel interviewed her during the JFS investigation, despite reading Strobel's report. She was also unable to recall the details that she reported to DCF and the PPD in June 2020 beyond saying that "it had something to do with the children having photographs of them in their underwear or something." Regarding the PPD's investigation, Jennifer said that the complaints had come directly from child 1, and that she only reported the complaints because other people "asked [her] to pursue it."

{¶ 83} As far as Jennifer's health, although she did not have any medical documentation to substantiate her claims of having cancer, she testified that she had four malignant tumors on the left side of her thyroid. She had previously taken "chemo pills"

27.

and had radiation for it, but was not receiving any treatment at the time of the hearing. Going forward, her doctors recommended that her thyroid be removed, but she had not had the operation.

{¶ 84} Regarding Christopher's guns, Jennifer testified that he began collecting guns sometime during their marriage, and eventually accumulated 30 or 40 guns. He kept them all in the house, but did not keep them locked up. She said that he left the guns "all over the house"; she found guns in drawers, the garage, the closet in the children's bedroom, and in their bedroom. He also had significant amounts of ammunition stored in the basement.

{¶ 85} Jennifer also testified that she would find bottles of urine "[a]ny time [she] would go into the basement * * *[,]" and that she threw the bottles away "a lot." Jennifer said that the children never went into the basement.

{¶ 86} Jennifer described Christopher as a "hoarder" who was unable to throw things away. She described their home as cluttered and having bugs. When she moved to Florida, she said that she cleaned the condo and disposed of three or four dumpsters full of garbage. When Jennifer had seen the condo during the children's video chats with Christopher, it "looks pretty dirty." In addition to piles of laundry, she said she saw falling ceiling tiles and "large amounts of garbage and other things."

{¶ 87} At the time of the final hearing, the children had been in Florida for almost three years. Jennifer said that the children were well integrated into their community. Child 1 was "doing really well." He was getting good grades in school and was being

28.

assessed for a gifted program. He was also continuing to see a counselor at school and a private counselor for posttraumatic stress disorder ("PTSD"). Child 2 had just started preschool and was doing well.

{¶ 88} Jennifer was living in a gated community that was very close to child 1's school. Waibel and his two children lived with Jennifer and the children. The children had friends and played with other children in the neighborhood. She took the children to the beach, parks, the zoo, and the pool.

{¶ 89} Jennifer did not believe that Christopher had "an honest interest" in having custody of the children. She thought that he "makes a lot of excuses for why he can't do things, whereas [she does not] make any excuses * * *." Jennifer asked the court to name her the residential and custodial parent of the children. She also wanted the court to "continue and maybe expand * * *" Christopher's visits with the children. She thought that Christopher having custody of the children would be detrimental to them, and that Christopher would attempt to keep the children from her. She recounted that Christopher had ignored her parents' request to stop by his house and drop off Christmas gifts for the children while they were in Perrysburg for a visit, which she thought would continue to happen in the future.

{¶ 90} Jennifer also had some concerns about Christopher's parenting. She said that child 1 "was always hurt in [Christopher's] care[,]" and that Christopher gave the children medicine without informing her. She had "never seen [Christopher] discipline the children, even if the children are acting out." And she recounted two incidents where

29.

Christopher had "yelled" or "screamed" at her in front of the children, including a time when he thought that she had hit child 1 in the head when she actually "merely tapped him on his shoulder * * *." Additionally, Christopher would "frequently" lock the children in their bedroom when she was not home, but she never did so.

### 3. The GAL's testimony

{¶ 91} Finally, Christopher called the GAL as a rebuttal witness. The GAL testified that he had several meetings with Christopher (including a home visit and visits when Christopher and the children were together, both at Christopher's home and in public), met with Jennifer while she was in Ohio, and did a home visit at Jennifer's home in Florida. The Florida home visit was at Jennifer's prior residence, but he did a tour of her current home on Zoom. He also spoke with "tangential" people in the children's lives and reviewed the reports from JFS, DCF, and the PPD.

{¶ 92} When the GAL did his home visit at Christopher's home, he intentionally gave Christopher only "10 or 15 minutes" to prepare for the visit so that he could observe the true condition of the residence. He did not find the house to be overly messy, and did not see guns and ammunition or bottles of urine all over the house. He did not see anything in the house that he found concerning. As he said on cross-examination, he has "been to the house over the span of the last year and a half, and it's always been clean and tidy."

{¶ 93} Because both Christopher's and Jennifer's significant others were spending "significant time" with the children, the GAL felt that it was important to talk to Taylor

30.

and Waibel. Although he had spoken to Taylor, he had "not been able to connect with [Waibel]."

{¶ 94} He was also unable to speak to child 1's teacher, despite attempting to contact her by phone and email. However, Jennifer provided him with child 1's grade cards and some correspondence from school, which were all positive.

{¶ 95} In speaking with child 1's counselor and reviewing her notes, the GAL was concerned that the counselor's "initial meeting was with mother, and the basis of all of the counseling is predicated on that [child 1] was abused by his dad, and that was what was disclosed during the first meeting, and that's the premise of the counseling going forward. [The GAL] can't speak to whether that affects the diagnosis or how it affects the treatment, but that is a concern."

{¶ 96} Taking all the information that he had gathered into consideration, the GAL recommended that (1) Christopher be named the children's residential parent, (2) Christopher continue his mental health treatment, (3) the children continue or be enrolled in counseling, (4) Jennifer have visitation with the children pursuant to the trial court's long-distance schedule, (5) Christopher allow the children to have liberal telephone and video chat contact with Jennifer, and (6) neither party make disparaging remarks about the other in the children's presence. He believed that moving the children to Ohio from Florida was in their best interests, despite the length of time that they had been living in Florida. He also thought that Christopher would be the parent who would better facilitate an ongoing relationship with the other parent.

31.

{¶ 97} On cross-examination, the GAL said that he believed VanderHorst's testimony regarding Christopher grabbing child 1 by his arm and pulling him from the car by his leg, and he agreed with Jennifer's attorney that he "would not characterize that as good parenting[.]" Although the GAL said that it was appropriate for Jennifer to report statements that child 1 allegedly made to authorities, when asked if he would fault Jennifer for reporting those matters, he said that he took issue with "[m]om's great length that she's gone to, from reporting it to Wood County, reporting it to Florida, contacting Perrysburg multiple times, the missing and abused and whatever agency that was, the progression that's taken place is above just reporting the issue * * *." Ultimately, it was "the nature of [Jennifer] trying to exclude father by any means that raised an issue with * * *" the GAL.

{¶ 98} Regarding Christopher's mental health, the GAL said on cross-examination that Christopher had been diagnosed with depressive disorder, and he did not doubt that Christopher had suicidal thoughts. But he did not know whether Christopher actually expressed those thoughts or followed through with the threats, so he did not have an opinion about that issue. He also admitted that he was not aware of any mental health diagnoses for Jennifer.

{¶ 99} Finally, the GAL also agreed with Jennifer's attorney that Jennifer had been "in full compliance with the terms of the court order with regard to the parenting time since the time it was filed forward * * *."

32.

## C. The magistrate's decision

{¶ 100} On July 13, 2021, the magistrate issued her decision from the final hearing. In her findings of fact, the magistrate determined that, when Jennifer left Christopher, she executed a "well planned" move to Florida with the children with the help of Waibel (whom she had been in a relationship with for "several years") and without providing Christopher any notice. Although the parties discussed moving to Florida, they had not made a decision about moving or decided on where in Florida to move. The move resulted in Christopher being unable to see the children from August to December 2018. Jennifer also forwarded all of the parties' mail to Florida when she moved, and that—combined with at least one medical provider receiving returned mail addressed to Christopher at Jennifer's address in Florida with the notation that Christopher "is dead!!"—resulted in Christopher having difficulty obtaining his diabetes medicines.

{¶ 101} Regarding the parties' support systems, Jennifer lived with Waibel in Florida. The magistrate found that he had been a caregiver for the children, particularly during daycare closures that resulted from COVID-19 shutdowns. However, "[t]here is scant information about Mr. Waibel - not his age, his mental health, his physical health, his educational background or his history of training. * * * There was not much information provided about the Waibel children either, despite the fact that they spend time with the Marlowe children at [Jennifer's] home." Jennifer also had an aunt and

33.

grandmother who lived nearby, and the children have visited them a few times, but neither testified.

{¶ 102} Taylor, Christopher's significant other, has enjoyed her limited time with the children and is willing to help with them if Christopher needs it. Christian lives near Christopher and enjoys spending time with the children. Christian testified that Christopher is "a good and caring father, who loves spending time with the children, and that he missed them very much." Christine said that she had not been able to spend much time with the children because she lives in South Carolina and the children live in Florida, but she wanted to spend as much time with them as possible. She said that Christopher "enjoyed spending time with the boys and the boys spending time with [Christopher]." Christopher also said that Jennifer's parents live in Northwest Ohio, and he was willing to facilitate the children's relationships with their maternal grandparents.

{¶ 103} Regarding the parties' health, the magistrate determined that Christopher had some health problems around the time of Jennifer's move, but had "resumed his good health." The GAL testified that he was aware that Christopher had been diagnosed with depressive disorder and admitted to having suicidal thoughts. Christopher admitted to having suicidal thoughts, but never acted on them. He sought counseling to deal with the stress of Jennifer leaving with the children and was doing well. Christopher had an insulin pump, so he no longer used needles. Jennifer told people around the time that she moved that she had stage IV cancer. She testified that it is thyroid cancer, but Greener—

34.

Jennifer's mother—thought that it was bowel cancer. The magistrate determined that "[t]here was no corroboration of [Jennifer's] diagnosis."

{¶ 104} Regarding the abuse allegations against Christopher, the magistrate found that JFS investigated allegations of physical abuse in 2018 and closed the case with the recommendations that Christopher obtain a mental health evaluation and not physically discipline the children, which Christopher said he complied with. Soon after Jennifer moved to Florida, Christopher was investigated for allegations of sexual abuse. No charges were filed as a result of the investigation, and Christopher said that he did not receive any recommendations. It was recommended that child 1 receive counseling, which Jennifer has obtained for him. Despite reports of father's allegedly inappropriate behavior to various state and national agencies, the only time a finding of abuse was substantiated was in the first Florida DCF investigation, but "the investigation was incomplete and predicated that its finding was based upon the report that [Christopher] was deceased."

{¶ 105} Although Christopher testified that he kept his guns secured and his ammunition stored in the basement, Greener testified that she saw an unsecured gun in a kitchen drawer. VanderHorst also testified that she saw two bullets on tables when she was watching child 1 in the parties' home. Greener and VanderHorst both testified that they had to move Christopher's insulin needles out of child 1's reach, and on one occasion child 1 ran off with an insulin needle when he was approximately two years old. Additionally, Greener recalled seeing bottles of urine in the basement.

35.

{¶ 106} Jennifer testified that Christopher had bottles of urine, unsecured needles, guns, and ammunition in the home while they lived there together. She also testified to Christopher engaging in "otherwise bizarre behaviors" and recounted suspicious fires at the home while Christopher was there alone. Christopher admitted to sometimes urinating in bottles while playing videogames, but the magistrate determined that "the home has now been cleaned up and it is appropriate for the children * * *." Regardless, the magistrate found it "concerning that [Christopher] did not consider the hygiene and safety of the children previously."

{¶ 107} Regarding Christopher's visitation with the children during the pendency of the case, the magistrate found that

Since [Jennifer] left with the children in September 2019 [sic], it is undisputed that Father only had about 30 days of visits with [the children] over the roughly 1,000 days since they had been moved to Florida. Of that time, [Christopher] has had only eight (8) overnight visits during the Christmas 2020 holiday, as that was all [Jennifer] would agree to. While Father missed a couple of opportunities to visit with the boys, this was due to his expectation that Mother and the boys would be traveling to Ohio for the previously scheduled final hearing dates and he anticipated seeing them when they were here in Ohio. On both those occasions, [Jennifer] filed motions to continue those hearings. Because those hearings were moved, [Jennifer] never travelled to Ohio and the visits with the children did not

occur. [Christopher] testified that he had made up or rescheduled the missed visits within a reasonable period of time.

[] Father travelled to Florida a number of times to have visits with his sons. [Jennifer] brought the children to Ohio generally at times when Mother had to be in Ohio anyway for Court proceedings.

[] The first time [Christopher] went to Florida to pick up the boys, he learned that there was a CSB investigation and there was a threat that he could be arrested. As a result, [Christopher] was reluctant to see the children until there was a court order in place and when he could arrange for another adult to be with him so that there would not be any further allegations. Since he was working around a Third Party's schedule to accompany him, it was more difficult to work out a time that was acceptable to everyone.

{¶ 108} The magistrate also found that Christopher "had to struggle to get time with the children" during the case, and that Jennifer's behavior (particularly around phone calls with Christopher) did "not seem to show respect for [Christopher's] role as the father of the children and does not show a desire to encourage the father-child relationship."

{¶ 109} As to the children's adjustment to Florida, the magistrate found that child 1 was in school and doing well, and that child 2 was recently enrolled in daycare.

37.

{¶ 110} The magistrate found that Christopher had "made a lot of preparations for a smooth transition for the boys" if he were named residential parent. He testified that he had taken preliminary steps to enroll child 1 in school and child 2 in daycare in Perrysburg, contacted the children's former pediatrician, and talked to his employer about flexibility in his schedule.

{¶ 111} In her conclusions of law, the magistrate made the following findings relative to the best-interest factors in R.C. 3109.04(F)(1):

- *(F)(1)(a) – The wishes of the child's parents regarding the child's care.*

    Each parent wanted to be named residential parent.

- *(F)(1)(c) – The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest.*

    The children have good relationships with both parents. Christopher and Jennifer each have family in Northwest Ohio, Christopher's family members have spent time with the children during the pendency of the case, and Christopher indicated that he would facilitate visitation with Jennifer's family.

- *(F)(1)(d) – The child's adjustment to the child's home, school, and community.*

    The children had resided in Florida for over two and one-half years and had adjusted well to their home and community there. There was little testimony about the children's interactions with their relatives in Florida or any

38.

significant bonds with friends and relatives who lived far away. But there was testimony that the children have family and friends near Christopher.

- *(F)(1)(e) – The mental and physical health of all persons involved in the situation.*

   "There is no evidence that either party's mental or physical health is an impediment to their parenting ability at this time."

- *(F)(1)(i) – Whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.*

   There was no evidence that Jennifer violated any court orders related to Christopher's parenting time, which the magistrate found "encouraging for future compliance." However, the magistrate also determined that Jennifer "removed the children from [Christopher] without notice and she has not made any real efforts to allow more than minimum time with [Christopher] in person or by phone."

The magistrate did not specifically address the factors in (F)(1)(b), (f), (g), (h), or (j).

{¶ 112} The magistrate also reviewed each of the shared parenting factors in R.C. 3109.04(F)(2), and determined:

- *(F)(2)(a) – The ability of the parents to cooperate and make decisions jointly, with respect to the children.*

39.

It was unlikely that the parties could communicate well enough to successfully execute a shared parenting plan. Jennifer's "move and her actions with the children thereafter, [] made communication very difficult." Additionally, Jennifer's "testimony and actions through the process do not provide the Court any confidence that the communication will improve any time soon."

- *(F)(2)(b) – The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent.*

    Christopher seemed "capable and willing" to foster the children's contact and relationship with Jennifer, but "[t]he evidence does not suggest the same for [Jennifer]" because there was "a significant track record of Mother's resistance to sharing the children with Father in any meaningful way."

- *(F)(2)(c) – Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent.*

    There was no evidence of any kind of child abuse, but there was "evidence of Mother's repeated, unsubstantiated claims of abuse by Father."

- *(F)(2)(d) – The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting.*

    The geographic distance between the parties would make it "difficult, if not impossible" for them to have a shared parenting plan.

- *(F)(2)(e) – The recommendation of the guardian ad litem of the child.*

40.

The GAL recommended that Christopher be designated the residential parent.

{¶ 113} Ultimately, the magistrate determined that Jennifer should be the residential parent and legal custodian of the children. In reaching that determination, the magistrate concluded that

[a]lthough neither parent is perfect, both parents have a lot to offer their children and should be very involved in their lives. [Jennifer] has proven that she could provide stability to the children when [Christopher] was suffering from some health issues. With the conclusion of the divorce, the court anticipates that [Jennifer] will follow the court orders and take more affirmative steps to acknowledge the importance of [Christopher's] role in the children's lives.

### D. The supplemental hearing

{¶ 114} Following the magistrate's decision, Christopher and Jennifer each filed objections with the trial court. The gist of Christopher's objections was that "the Magistrate's Findings of Fact overwhelmingly support a decision to designate [Christopher] as the residential parent and legal custodian." As relevant to this appeal, Jennifer objected to the amount of visitation that the magistrate awarded to Christopher.

{¶ 115} While the objections were pending, Christopher requested that the trial court hold a supplemental hearing on parenting issues because Jennifer had recently moved and changed jobs, which would "impact the minor children in a way that was not

41.

contemplated by the Magistrate in her decision." The trial court granted his request and held a hearing on December 20, 2021.

### 1. Jennifer's testimony

{¶ 116} Jennifer testified that she and the children moved from Fort Myers at the end of August 2021 because Waibel got a job in Tampa, which was approximately a two-hour drive from their former residence. The move required child 1 to switch to a new school and child 2 to transfer to a new preschool. At the time of the move, Jennifer did not have a job in Tampa, but she obtained a contract position through an employment agency shortly after the move.

{¶ 117} Jennifer sent Christopher an email alerting him to the move on August 1. When child 1 school started on August 10, Jennifer said that they were still living in Fort Myers and commuting or staying in hotels so that child 1 could attend school in Tampa. Despite Jennifer and Waibel's lease listing a start date of August 2, she said that they did not get immediate possession of the home and were unable to move until August 28.

{¶ 118} Jennifer said that child 1 was doing "[w]onderfully" in school and that child 2 was doing "so well" in his preschool. Both children had friends in their current neighborhood, which Jennifer described as a residential neighborhood with lots of families and neighborhood activities for the children. Although she and Waibel intended to move after their current lease expired, they planned to stay in the same neighborhood and school district. The children also had a pediatrician in Tampa, and child 1 was

42.

continuing to receive counseling from his former provider in Fort Myers, primarily through telehealth sessions.

{¶ 119} Jennifer testified that this was the third home she and the children had lived in, and the third school that child 1 had attended, since Jennifer moved to Florida in September 2018. However, the makeup of the household had not changed. Additionally, Jennifer said that her parents intended to move somewhere near her in Florida after her father retired, which would be in approximately one year.

{¶ 120} The parties were continuing to follow the visitation schedule established in the temporary order. Jennifer said that she never missed a visit when she had to bring the children to Ohio, but Christopher had missed 10 of his 13 scheduled visits in Florida. Jennifer also permitted Christopher to have additional parenting time with the children over the Thanksgiving holiday in 2021.

### 2. Christopher's testimony

{¶ 121} Christopher testified that he received notice from Jennifer on August 1, 2021, that she was moving to Tampa; they had not had any conversations about the move before that. Based on text messages that he received from Jennifer in late July, Christopher purchased school supplies for child 1 using the supply list provided by his school in Fort Myers. However, he later learned from the person who would have been child 1's teacher in Fort Myers that child 1 was not enrolled in the Fort Myers school for the 2021-2022 school year. He also gathered from his conversations with child 1 that they were already living in Tampa when school started on August 10.

43.

{¶ 122} Christopher was concerned about this move because it was the third move since Jennifer took the children to Florida, and the third set of schools that they had attended, and he did not think that it was "good for them to keep moving around."  He was also concerned about Jennifer's new job because her employment was based on short, 13-week contracts, which he thought created instability for Jennifer and the children.  On cross-examination, Christopher admitted that he did not voice his objection to Jennifer's move directly to her; his only "objection" was filing his request for a supplemental hearing.  And despite the fact that returning to Ohio would require the children to move another time, Christopher believed that it would ultimately be a more stable environment for them; he did not intend to move in the near future and the children have extended family in the area.

{¶ 123} Regarding his missed visits with the children, Christopher said that some of them were missed because Jennifer was supposed to be in Ohio for court dates and was going to bring the children with her, but she asked to have the dates continued.  Additionally, he had to account for another person's schedule because he always took another adult with him on his visits due to the "allegations that have come out during this * * *."  He has rescheduled and made up visits that he canceled.  He agreed that Jennifer cooperated with him regarding the Thanksgiving 2021 visit when he proposed it.

### 3. The GAL's testimony

{¶ 124} The final witness at the supplemental hearing was the GAL.  He testified that he conducted further investigations after Christopher filed his motion for a

44.

supplemental hearing. He spoke to and met with Christopher, did a Zoom tour of Jennifer's new home, and emailed Jennifer some questions, which she responded to. None of the information that he gathered changed his earlier recommendation that Christopher be named the residential parent.

{¶ 125} The GAL said that he "has a lot of concerns on both sides of the case for a lot of different issues." Among those concerns were Jennifer's frequent moves and potential issues with the stability of her employment, as well as issues with Christopher missing visits with the children, which the GAL said "raises an issue of whether he wants to see the kids and whether he wants to participate as a parent." Although the guardian said that he had "struggled with this recommendation from the get-go[,]" after taking all of the available information into consideration he still believed that Christopher being named the residential parent was in the children's best interests.

### E. The trial court's decision

{¶ 126} On September 9, 2022, the trial court issued its final judgment entry of divorce, including its decision on the parties' objections to the magistrate's decision. In its decision, after reviewing the portions of the magistrate's decision that the parties objected to, the trial court went through each of the best interest factors in R.C. 3109.04(F)(1) and made the following findings:

- *(F)(1)(a) – The wishes of the child's parents regarding the child's care.*

  Each parent wanted to be named the residential parent, and each parent was equally able to care for the children.

45.

- *(F)(1)(b) – If the court has interviewed the child in chambers, the wishes and concerns of the child, as expressed to the court.*

  Although the court did not conduct an in camera interview with the children, the GAL reported that child 1 (who was five at the time) said that he did not like seeing Christopher for visits, but later said that he wanted to see Christopher twice a day because he missed seeing his dad.  Child 1 also said that he wanted to see Jennifer daily.  Child 2 was less than two years old, so the GAL did not interview him.

  The court went on to say that Jennifer had engaged in behaviors—for example, moving far away, accusing Christopher of abuse, and denying access to the children—that caused "certain amounts of distance and possible alienation from Father."  The court took that and child 1's inconsistent statements into account in reaching the conclusions that child 1 "would like to see his father, but does not want to interrupt his current living situation[,]" and that he has "certain ideas and conclusions about his father that might not be his own independent decision but unfairly influenced by his mother."

- *(F)(1)(c) – The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest.*

  The children have good relationships with both parents.  Christopher and Jennifer each have family in Northwest Ohio, and Christopher has been

intentional about fostering the children's relationships with his side of the family. There was little evidence regarding the children's relationships with Jennifer's family members who live in Florida, and there was "no testimony or indication that maternal grandparents or other relatives in Florida would be as involved as the extended family of [Christopher] in Northwest Ohio."

Further, the court took issue with the fact that Waibel—who, through proximity alone, might be the most significant male influence in the children's lives—was not interviewed by the GAL or made available for an interview, and that the court had "no information on how he is referred to in the home, what involvement he has with the boys, and what his relationship is with the boys." The only information about Waibel came from Jennifer's testimony at the supplemental hearing. "The paucity of evidence concerning Mr. Waibel causes both pause and concern to the Court in considering [Jennifer] as a residential parent." Conversely, the court found that the "facts of [Christopher's] living situation, support system and extended family are clear."

Ultimately, the evidence of Christopher's support system and intentional involvement of extended family in the children's lives, and the lack of evidence "concerning an essential part of [Jennifer's] household * * *" led the court to determine that this factor favored Christopher.

- *(F)(1)(d) – The child's adjustment to the child's home, school, and community.*

Although "[i]t could be said" that the children had adjusted well to living in the state of Florida, the court found this point difficult to address because Jennifer and the children had lived in three different homes in Florida, and Jennifer testified that they were going to move again in the relatively near future. The frequent moves required child 1 to attend three different schools. The court concluded that "[t]here is no clear evidence as to how the boys have adjusted to life with their mother in Florida because they have not had one place to live or adjust to for more than a year." Based on the testimony presented, the court concluded that "the children have no long-term meaningful connection to the community or people in Florida, other than with [Jennifer] and her significant other, Mr. Waibel, which the Court knows little or nothing about."

Christopher, on the other hand, remained in the marital home since Jennifer left. This led the court to find that this factor favored Christopher.

- *(F)(1)(e) – The mental and physical health of all persons involved in the situation.*

Although Christopher had experienced mental health issues and complications from diabetes in the past, he had addressed his mental health concerns through counseling and medically controlled his diabetes. Jennifer indicated that she had cancer, but the court determined that she "seems to be in remission or, at least, not suffering from this disease." Thus, the court

concluded that both parties were appropriate to be designated as the residential parent under this factor.

- *(F)(1)(f) – The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights.*

    "Although it is hard to predict, the past actions of [Jennifer] demonstrate she is willing to ignore orders of the Court and deny [Christopher] visitation and has shown little regard for [Christopher's] ability to have a meaningful relationship with their children." The court also found it concerning that the GAL had found Jennifer to be "misleading in certain instances[,]" and said that the circumstances surrounding Jennifer's move to Florida "demonstrate someone willing to mislead to gain the results she would want." The court said that Jennifer's actions reflected on "the willingness of [Jennifer] to work for the best interest of the children." Accordingly, the court concluded this factor weighed in favor of Christopher.

- *(F)(1)(g) – Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order.*

    This factor was not applicable.

- *(F)(1)(h) – Whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child.*

Despite the allegations and investigations regarding abuse of the children, the court found that there was "no evidence to indicate that either parent has acted in a manner that would put the children in danger or at risk." In the JFS investigation that resulted in recommendations for Christopher, Christopher followed all recommendations.

- *(F)(1)(i) – Whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court.*

    "Although [Jennifer] has generally complied with orders of the court regarding visitation, it is apparent that she will do as much as possible to keep [Christopher's] time with his children as limited as possible."

- *(F)(1)(j) – Whether either parent has established a residence, or is planning to establish a residence, outside this state.*

    When Jennifer moved to Florida in 2018, she did so unilaterally and excluded Christopher from any consideration. She used her employment as a pretense to "commence or continue a relationship with Dennis [sic] Waibel." The court went on to consider the factors in R.C. 3109.04(F)(2), and found:

- *(F)(2)(a) – The ability of the parents to cooperate and make decisions jointly, with respect to the children.*

Because of the physical distance between Jennifer and Christopher and the "obvious discord" between them, there was little evidence that they would be able to cooperate and make joint decisions.

- *(F)(2)(b) – The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent.*

  Jennifer had not "demonstrated a willingness to encourage love, affection or contact with [Christopher]." The court noted that Jennifer "must allow her children to maintain a relationship with their father * * * [and] must still cooperate, compromise and conciliate with [Christopher] for the benefit of their children." Jennifer's actions to that point did not demonstrate that she was willing to do those things.

- *(F)(2)(c) – Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent.*

  "Although numerous investigations were initiated there is no evidence of child abuse, spousal abuse or other domestic violence by either party."

- *(F)(2)(d) – The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting.*

  "The geographic proximity of the parties – Florida and Ohio – make shared parenting impossible."

- *(F)(2)(e) – The recommendation of the guardian ad litem of the child.*

The GAL recommended that (1) Christopher be designated the residential parent, (2) Jennifer have visitation according to the court's long-distance parenting schedule, (3) Jennifer be allowed liberal phone and video chat contact with the children, (4) neither party make disparaging remarks about the other, and (5) Christopher continue counseling and following the recommendations from his mental health assessment.

The GAL's investigation was "complete and comprehensive[,]" and the only part of his duties that he was unable to complete (i.e., speaking with all physical custodians of the children) was made impossible by Jennifer failing to make Waibel available for an interview with the GAL.

The court "found no reason for the magistrate to have rejected the conclusions or recommendations of the guardian. In fact, the Court finds the conclusions of the Guardian ad Litem to be more consistent with the facts and circumstances of this case."

{¶ 127} Considering the entirety of the record and all of the factors in R.C. 3109.04(F), the court found that "the magistrate's application of the facts to the applicable law was not done appropriately and that the conclusion to designate [Jennifer] as the residential parent was inappropriate considering all factors." Therefore, the trial court found that Christopher's objections to the magistrate's decision were well-taken, and Jennifer's objections were moot. The court ordered that Christopher be designated

52.

the residential parent and legal custodian of the children and established a visitation and phone call schedule for Jennifer.

{¶ 128} Jennifer now appeals, raising one assignment of error:

> The trial court's determination granting Father's Objections, overruling the Magistrate's Decision, and designating Father as the residential parent and legal custodian of the minor children of the parties was an abuse of discretion and/or against the manifest weight of the evidence[.]

## II. Law and Analysis

{¶ 129} In her assignment of error, Jennifer argues that the trial court abused its discretion by naming Christopher residential parent and legal custodian of the children. She points to the trial court's findings under seven of the best-interest factors in R.C. 3109.04(F) that she believes are against the manifest weight of the evidence. She claims that the trial court's ultimate allocation of parenting rights is an abuse of discretion because the trial court misinterpreted the facts and failed to consider her role as the children's primary caregiver.

{¶ 130} Christopher responds that the cases Jennifer relies on to support her argument that the trial court should have given more consideration to her role as primary caregiver predate significant amendments to R.C. 3109.04 in 1991, and that both parents statutorily "stand upon an equality" regarding care and custody of their children. Christopher also contends that Jennifer ignores facts in the magistrate's and trial court's

53.

decisions that do not support her position, and that the trial court's decision was fully supported by the evidence.

{¶ 131} Because the trial court's factual findings are supported by some competent, credible evidence, and the trial court's allocation of parental rights and responsibilities is not unreasonable, arbitrary, or unconscionable, we reject Jennifer's arguments.

## A. Standard of review

{¶ 132} The decision that Jennifer appeals from is the trial court's ruling on objections to the magistrate's decision. A trial court reviews a magistrate's decision de novo. *Brancatto v. Boersma*, 6th Dist. Lucas No. L-12-1271, 2013-Ohio-3052, ¶ 8. In completing this de novo review, "[n]ot only is the [trial] court not bound by the magistrate's decision, the court has an obligation to conduct an independent review as to the objected matters to ascertain whether the magistrate has properly determined the facts and appropriately applied the law." *Id.*, citing Civ.R. 53(D)(4)(d); and *Kovacs v. Kovacs,* 6th Dist. Erie No. E-03-051, 2004-Ohio-2777, ¶ 6.

{¶ 133} On appeal, however, we review a trial court's ruling on the objections to a magistrate's decision for an abuse of discretion. *Id.* at ¶ 9. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 2019-Ohio-223, 131 N.E.3d 423, ¶ 13 (10th Dist.),

54.

citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.*, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 10th Dist. Franklin No. 08AP-69, 2008-Ohio-3567, ¶ 11. And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.* Moreover, an abuse of discretion "involves more than a difference in opinion * * *." *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, --- N.E.3d ----, ¶ 24. Importantly, "[f]or a court of appeals to reach an abuse-of-discretion determination, the trial court's judgment must be so profoundly and wholly violative of fact and reason that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." (Internal quotation and citations omitted.) *Id.*

{¶ 134} In determining whether the trial court abused its discretion, we presume that the trial court's factual findings were correct, and "will not reverse a particular factual determination unless it is against the manifest weight of the evidence." *Ayers v. Ayers*, 6th Dist. Wood No. WD-21-010, 2022-Ohio-403, ¶ 13, *conflict certified on other grounds*, 167 Ohio St.3d 1442, 2022-Ohio-2162, 189 N.E.3d 818, citing *Funkhouser v. Funkhouser*, 6th Dist. Erie No. E-18-039, 2019-Ohio-733, ¶ 17. Findings that are supported by some competent, credible evidence in the record are not against the manifest weight of the evidence. *Id.*, citing *Ross v. Ross*, 64 Ohio St.2d 203, 204-205, 414 N.E.2d 426 (1980); *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159

55.

(1997). Our review is deferential to the trial court because "the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis* at 418. Giving deference to the trial court's findings is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does *not* translate to the record well." (Emphasis sic.) *Id.* at 419.

{¶ 135} Thus, our review of the trial court's decision on the allocation of parental rights and responsibilities encompasses two separate decisions: (1) whether the trial court's allocation was an abuse of discretion, and (2) whether the factual findings underlying the trial court's allocation were supported by some competent, credible evidence (i.e., are not against the manifest weight of the evidence).

### B. R.C. 3109.04

{¶ 136} A trial court's allocation of parental rights and responsibilities is governed by R.C. 3109.04. The statute requires that, in a divorce case that does not involve a proposed shared-parenting plan, "the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children * * *." R.C. 3109.04(A)(1). Where custody has never been litigated, the parties stand on equal footing regarding allocation of parental rights and responsibilities. R.C. 3109.03.

56.

{¶ 137} In making its allocation, the trial court must consider the best interests of the children. R.C. 3109.04(B)(1). In fact, "[t]he children's best interest is the sole issue * * *." *In re A.K.,* 2d Dist. Champaign No. 09-CA-32, 2010-Ohio-2913, ¶ 22, citing *Pyburn v. Woodruff,* 2d Dist. Clark No. 2009-CA-10, 2009-Ohio-5872, ¶ 8. To determine what is in the children's best interests, R.C. 3109.04(F)(1) requires the court to "consider all relevant factors, including, but not limited to:"

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

57.

(h) Whether * * * there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 138} Subsection (F)(1)'s catchall provision allows the trial court to consider factors outside of the statute in its best-interests determination. This includes considering the role of one parent as the children's primary caregiver. Importantly, "[a] party's status as a child's primary caregiver is a relevant factor which a court should consider in evaluating a child's best interest, but it is not a *controlling* factor." (Emphasis added.) *M.M. v. V.S.*, 6th Dist. Lucas No. L-21-1176, 2022-Ohio-1531, ¶ 39, citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23-24, 550 N.E.2d 178 (1990).

{¶ 139} In this case, although the trial court determined that "shared parenting is not practical, * * *" the court found that the best-interest factors in R.C. 3109.04(F)(2) (relating to shared parenting) were relevant to the court's decision. Those factors are:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

58.

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

*Id.*

### C. The trial court did not abuse its discretion by naming Christopher the children's residential parent and legal custodian.

**{¶ 140}** In her brief, Jennifer primarily argues that the trial court abused its discretion because its factual findings—which it used to reach its determination that Christopher should be the residential parent and legal custodian—are against the manifest weight of the evidence. We disagree.

**{¶ 141}** As outlined above, the trial court's judgment entry carefully and thoroughly reviewed the evidence before the magistrate, as well as the information the court learned at the supplemental hearing, before reaching the conclusion that naming Christopher residential parent and legal custodian was in the children's best interests. Our review of the record shows that the trial court's factual findings are supported by some competent, credible evidence. That is, nothing in the record overcomes the presumption that the trial court's factual findings are correct.

59.

{¶ 142} For example, Jennifer contends that the trial court's finding under R.C. 3109.04(F)(1)(f) that "the past actions of [Jennifer] demonstrate she is willing to ignore orders of the Court and deny [Christopher] visitation and has shown little regard for [Christopher's] ability to have a meaningful relationship with their children" is not supported by the record. Although Jennifer is correct that she complied with court-ordered visitation, there is still some competent, credible evidence in the record that she "has shown little regard for [Christopher's] ability to have a meaningful relationship with their children." Specifically, (1) Jennifer moved the children to Florida without consulting Christopher or giving him any notice,[1] (2) the children were often unavailable at the time the parties agreed on for phone calls, (3) Jennifer only allowed Christopher the bare minimum amount of contact required by the temporary parenting time order, (4) Jennifer monitored the children's phone calls with Christopher, (5) Jennifer reported misleading information to the GAL in an apparent attempt to make Christopher look bad, and (6) Jennifer's repeated reports of Christopher's behavior made it more difficult for him to see and spend time with the children because he felt it was necessary to include a third person in his visits to prevent more accusations. This evidence is sufficient to support the trial court's findings under R.C. 3109.04(F)(1)(f).

---

[1] Despite Jennifer's protestations, the fact that she moved to Florida, in and of itself, is not what the trial court took issue with; it was the manner in which she went about the move—e.g., not giving Christopher notice before she moved with the children, saying that she moved for a job (or possibly cancer treatments) instead of telling him that she moved to be with Waibel—that the trial court found problematic.

60.

{¶ 143} Similarly, there is some competent credible evidence to support the trial court's finding under R.C. 3109.04(F)(1)(d) that "[t]here is no clear evidence as to how the boys have adjusted to life with their mother in Florida * * *." On a macro level, as the court said, the boys seem to have adjusted well to living in the state of Florida. But Jennifer and the children have not stayed in any one home or community for more than about a year, so there was not much evidence regarding how the children had adjusted on a micro level, i.e., to their current home, school, and community in Tampa. The frequent moves, and child 1's frequent changes of schools, combined with a lack of evidence regarding the children having close relationships with anyone in Florida outside of their household, led the trial court to conclude that "the children have no long-term meaningful connection to the community or people in Florida * * *." We cannot say that this conclusion was against the weight of the evidence.

{¶ 144} The crux of Jennifer's argument on this factor is that the children have been in Florida for approximately four years with her as their primary caregiver. These are factors that the trial court can consider, but neither is a controlling factor in making a custody determination. *See M.M.*, 6th Dist. Lucas No. L-21-1167, 2022-Ohio-1531, at ¶ 39. Moreover, courts tend to view these arguments unfavorably when the reason that one parent is the long-term primary caregiver is because that parent unilaterally moved the children far away from the other parent. *E.g., Rarden v. Rarden*, 12th Dist. Warren No. CA2013-06-054, 2013-Ohio-4985; *Maine v. Jones*, 7th Dist. Mahoning No. 06 MA 191, 2007-Ohio-5043.

61.

{¶ 145} Although Jennifer says in her brief that the trial court could not give the fact that she was the children's primary caregiver "a presumptive value," she essentially argues that that the trial court erred by not giving that fact more weight. The trial court's decision does not say, specifically, that the court considered Jennifer's role at the primary caregiver, but the court acknowledged that the children have lived with Jennifer in Florida for approximately four years, implicitly recognizing her role as caregiver. However, based on the totality of the information before it, the trial court apparently concluded that Jennifer's role as caregiver was insufficient to outweigh the best-interest factors in Christopher's favor. This was not an abuse of discretion.

{¶ 146} Additionally, "a trial court does not have to mention each and every fact in support of a decision finding that it is in the best interest of a child to award primary custody of a child to a parent." *Meyers-Decator v. Decator*, 6th Dist. Williams No. WM-09-019, 2010-Ohio-4699, ¶ 33. Our review of the record does not reveal anything that the trial court failed to consider or that requires us to reverse the trial court's decision on that basis. The fact that Jennifer does not agree with the way the trial court weighed the evidence before it does not render the trial court's decision an abuse of discretion. *See Weaver*, Slip Opinion No. 2022-Ohio-4371, --- N.E.3d ----, at ¶ 24 (abuse of discretion "involves more than a difference in opinion * * *").

{¶ 147} Finally, the majority of Jennifer's arguments misconstrue the evidence before the trial court. For example, she claims that, contrary to the trial court's findings, the GAL "did, in fact, observe Mr. Waibel interacting with the minor children, [and]

62.

found they got along well * * *." However, the GAL testified that he had not "been able to connect with" Waibel. He said that "Mr. Waibel was not there when [he] did the first [in-home] visit. The Zoom one he was present but * * * the kids were running around, they weren't really interacting with mom or Denis at the time, or weren't on camera when [the GAL] was watching." Nothing in the GAL's statement indicates that he observed Waibel interacting with the children; on the contrary, he specifically said that the children were *not* interacting with Jennifer or Waibel during his Zoom visit. Additionally, on cross-examination, the GAL responded affirmatively when defense counsel asked, "And the children, as far as you know, get along fine with [Waibel]?" That response is not the same as the GAL determining that the children "got along well" with Waibel; at best, it is an indication that the GAL did not have information showing that the children and Waibel got along poorly.

{¶ 148} Similarly, regarding the trial court's finding that neither party had acted in a way that resulted in a child being an abused child, Jennifer's argument that the trial court was wrong in determining that the abuse allegations against Christopher were unfounded is belied by the evidence.

{¶ 149} First, although Jennifer says that VanderHorst witnessed Christopher abusing child 1, VanderHorst did not say that she thought Christopher's actions were abusive. She said that she "wasn't real happy with * * *" Christopher pulling child 1 out of the car, but did not opine further. Second, the JFS investigation did not substantiate the allegations of physical abuse. Strobel specifically testified that there were no findings

63.

relative to her investigation because it was an alternative response case, and that she did not have sufficient evidence to elevate it to a regular case. Third, DCF's finding of sexual abuse was predicated on DCF's understanding that Christopher was dead. There is no way of knowing if the agency's conclusion would have changed if its investigator had been able to conduct a complete investigation that included speaking to Christopher. But we do know that the PPD investigated the same allegations—and interviewed Christopher in the process—and, following the investigation, the Wood County prosecutor declined to file charges. And although the GAL acknowledged that child 1 had a PTSD diagnosis, after talking with the counselor, he expressed concerns about the diagnosis being based on Jennifer's report to the counselor that Christopher had abused child 1. Jennifer did not present any evidence or testimony to corroborate or explain the PTSD diagnosis.

{¶ 150} Additionally—and importantly—whether Christopher's disciplinary actions met the statutory definition of child abuse was a factual issue for the trial court to determine. *See* R.C. 3109.04(J)(1) (definitions of "abused child" in R.C. 2151.031 apply for purposes of the statute); R.C. 2151.031(C), (D) (defining "abused child"). Under R.C. 2151.031(C), "a child exhibiting evidence of corporal punishment or other physical disciplinary measure by a parent * * * is not an abused child * * *," unless the punishment is excessive under the circumstances and causes a substantial risk of serious physical harm. *Id.*, citing R.C. 2919.22. Physical discipline—and any other injury to a

64.

child—can constitute abuse if the child "suffers physical or mental injury that harms or threatens to harm the child's health or welfare." R.C. 2151.031(D).

{¶ 151} Assuming that Christopher pulling child 1 out of the car was a disciplinary measure, whether or not his actions were excessive, there was no evidence that they caused physical injury or a substantial risk of serious physical harm. And, although PTSD can be a mental injury that harms or threatens a child's health or welfare and constitutes abuse under R.C. 2151.031(D), *C.A.P. v. M.D.P.*, 8th Dist. Cuyahoga No. 109882, 2021-Ohio-3030, ¶ 28, the evidence in this case was not clear-cut. Jennifer testified that child 1 suffered from PTSD, and the GAL acknowledged the diagnosis, but the GAL also had concerns about the diagnosis because it was based solely on Jennifer's reports to child 1's counselor that child 1 was abused by Christopher. Jennifer did not call the child's counselor to testify or attempt to admit any of the counseling records into evidence to support her belief that Christopher abused child 1. Credibility determinations and the weight to be given the evidence are matters primarily within the province of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trial court here apparently discounted the child's PTSD diagnosis, which it was entitled to do. And without competent and credible evidence of a mental injury to child 1, the definition of abuse in R.C. 2151.031(D) is inapplicable.

65.

**{¶ 152}** In sum, we have considered each point that Jennifer raises. But we are mindful that

> [t]he discretion which a trial court enjoys in custody matters should be afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record.

*Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 20, citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). The record in this case sufficiently supports the trial court's decision, so we cannot conclude that the court abused its discretion in determining that designating Christopher as the residential parent and legal custodian was in the children's best interests.

### III. Conclusion

**{¶ 153}** Because the trial court did not abuse its discretion by naming Christopher the residential parent and legal custodian of the children, the September 9, 2022 judgment of the Wood County Court of Common Pleas, Domestic Relations Division, is affirmed. Jennifer shall return the children to Christopher in Ohio within seven days of the journalization of this decision. The stay issued in this case is terminated.

**{¶ 154}** Jennifer is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                _____
                                                     JUDGE

Christine E. Mayle, J.              

                                          _____
Charles E. Sulek, J.                                 JUDGE
CONCUR.

                                          _____
                                                     JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.